Karl MANSOOR, Plaintiff,

v.

COUNTY OF ALBEMARLE,
et al., Defendants.

No. CIV.A.3:00CV00047.

United States District Court,
W.D. Virginia,
Charlottesville Division.

Feb. 5, 2002.

Deborah Chasen Wyatt, Wyatt & Assoc., Charlottesville, VA, Barbara S. Jenkins, Jenkins & Hagy, P.L.C., Charlottesville, VA, for plaintiff.

Mark Dudley Obenshain, Wharton, Aldhizer & Weaver, PLC, Harrisonburg, VA, for County of Albemarle, Robert Tucker, Larry Davis, Mark Trank, John Miller, Richard Douglas Rhoads, defendants.

William N. Watkins, Sands, Anderson, Marks & Miller, Richmond, VA, for Cynthia Favret, defendant.

John Joshua Wheeler, Charlottesville, VA, for amicus.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

The plaintiff, Karl Mansoor, a police officer for the Albemarle County Police Department, brought this § 1983 claim against the County of Albemarle and six individual defendants whom he alleges all took part in a conspiracy to deprive him of his First Amendment rights. Five of the individual defendants work for the county (hereinafter "county defendants"): Robert Tucker, chief executive of Albemarle County, Larry Davis and Mark Trank, counsel for the county, John Miller, chief of the county police department, and R. Douglas Rhoads, captain of the police department. The sixth defendant, Dr. Cynthia Favret, is the psychologist hired by the county to evaluate the plaintiff. The plaintiff alleges that the defendants were all involved in the creation of a plan which conditioned the plaintiff's further employment on his not making any critical statements about any county employee at any time to any third party. The plaintiff also alleges a state law claim of fraud against the county defendants. For the reasons set forth below, the plaintiff's summary judgment motion shall be granted in part and denied in part; the county and county defendants' summary judgment motions shall be granted in part and denied in part; and the summary judgment motion of defendant Favret shall be granted.

### I.

The following facts are undisputed, unless otherwise noted. The plaintiff began work for the Albemarle County Police Department on August 1, 1994, and regularly received above average reviews for his performance. In April 1997, the plaintiff attended a Board of Supervisors' meeting where he expressed criticism about a proposed pay plan for the police department. The plaintiff also challenged defendant Tucker for allegedly derogatory remarks he made about the police department to a local journalist. Defendant Tucker later sent a letter to the plaintiff in which he denied any such remarks and called on the plaintiff to prove his accusation.

The plaintiff claims that after this incident, he was the target of retaliatory acts including being deprived of overtime work at a local shopping mall, being denied a training opportunity and even being the victim of an attempted assault by a police sergeant. (Pl.'s Ex. X.) Moreover, the plaintiff states that he went to Chief Miller to discuss various concerns he had, but to

no avail. According to the plaintiff, the result of the stress and pressure from his workplace contributed to the onset of panic attacks with symptoms including extreme anxiety, rapid heart beat, profuse sweating, shaking and shortness of breath. In early 1998, the plaintiff sought treatment from a private counselor, Dr. Hocking, who diagnosed him with a panic disorder. At the recommendation of the doctor, the plaintiff took a forty day medical leave beginning in March 1998.

In early May 1998, Dr. Hocking recommended that the plaintiff be allowed to return to work. In a letter to Lieutenant S. Earl Newton, Dr. Hocking indicated that the plaintiff showed significant improvement and that while the panic disorder was not fully resolved it was manageable. (Defs.' Ex. 5.) At around this same time, the plaintiff delivered to defendant Miller a letter dated April 20, 1998, in which the plaintiff laid out grievances, complaints and concerns going back to the plaintiff's first days in the department. This included references to the above-mentioned incidents regarding overtime work at the mall, the events surrounding the Board of Supervisors' meeting, the alleged assault attempt by a sergeant as well as claims of plaintiff's sexual harassment by a female supervisor. The plaintiff also criticized the department's new high speed pursuit policy with the plaintiff vowing to hold Miller, Tucker and all members of the Board of Supervisors responsible if either he or a citizen was ever injured because of the policy. (Defs.' Ex. 4.)

According to defendant Miller, the tone of the plaintiff's letter taken together with the somewhat muted endorsement of Dr. Hocking failed to satisfy his concerns about the plaintiff's fitness to return to duty. As such, he asked defendant Rhoads and Lieutenant Newton to meet with Dr. Hocking to discuss the plaintiff's fitness for duty. Dr. Hocking explained that the lengthy complaint letter sent by plaintiff was a type of therapeutic exercise written earlier in his treatment and did not reflect the plaintiff's present attitude toward work.

The defendant claims he remained concerned. Meanwhile, the plaintiff had received news that his claims for workman's compensation for reimbursement of medical expenses and leave were denied. On or about June 6, 1998, the plaintiff discussed with Chief Miller the possibility of getting reimbursed. On June 25, 1998, Chief Miller sent a letter to Dr. Hocking in which he requested information on the causal factors of the plaintiff's disorder. He explained that this request was in order to evaluate the plaintiff's request for reimbursement of certain medical expenses and to determine if the plaintiff continued to be fit for duty. (Defs.' Ex. 9.) In his response, Doctor Hocking stated that "a growing feeling of powerlessness, underlying anger, and a sense that [the plaintiff] somehow could not express his dissatisfaction or concerns to his superiors in the department contributed to [the plaintiff's] development of a panic disorder." (Defs.' Ex. 10.) The doctor concluded with his opinion that the "factors which did contribute to his panic disorder, in my opinion, are much less clear cut, clearly open to interpretation, but nevertheless are job-related in the broader sense of the term." (Defs.' Ex. 10.)

After Chief Miller received Dr. Hocking's letter, he informed defendant Rhoads in a memo that he believed a second opinion was warranted. The plaintiff was requested to report to Dr. Favret for an evaluation. While defendant Miller maintains that this request was the result of his underlying concern for the plaintiff's fitness for duty, the plaintiff claims that he was unaware of this purpose. Indeed, the plaintiff states that he was led to believe

that the appointment with Dr. Favret was set up because the department needed to be satisfied that the cause of the plaintiff's panic disorder was job-related for the purposes of his reimbursement claim. While Chief Miller and Lieutenant Newton recall that the question of reimbursement may have been mentioned in their discussion with the plaintiff, they both also state that they had informed the plaintiff that he needed to see Dr. Favret for a determination of fitness of duty. The plaintiff himself confirmed his awareness of defendant Miller's concerns over his fitness for duty, in an email from the plaintiff to defendant Miller, dated July 17, 1998. In this communication, the plaintiff acknowledged that defendant Miller had asked for information from Dr. Hocking in order to determine the plaintiff's fitness for duty. (Pl.'s Ex. LL.) In addition, at his first meeting with Dr. Favret, the plaintiff signed a consent form which stated that the "purpose of this psychological consultation ... is to determine psychological status as it pertains to my ability to discharge my duties in the capacity of police officer...." (Defs.' Ex. 13.)

Still, the plaintiff maintains that he was essentially duped into going to this evaluation on the pretense that his request for reimbursement required a second opinion. The plaintiff believes that this evaluation was the beginning of a plot by the county defendants, in concert with Dr. Favret, to deprive the plaintiff of his First Amendment rights. The first step, according to the plaintiff, was to obtain an unfavorable evaluation from Dr. Favret.

The plaintiff continued in his work as a police officer during this time. Indeed, he received a letter from a local resident praising his professional response to a burglary alarm at a resident's home. (Pl.'s Ex. FF.) That summer, the plaintiff also filed a performance complaint against Chief Miller for failure to investigate the

events surrounding his overtime work at the mall, the events related to the Board of Supervisors' meeting in April 1997 and for failure generally to investigate the other incidents mentioned by the plaintiff in his April 20, 1998 letter. (Defs.' Ex. 11.)

In September 1998, the plaintiff sent an email to defendant Rhoads inquiring into what defendant Miller was doing about investigating the plaintiff's complaints. Later in the month, police officers were given a questionnaire and asked to check off from a two column list of items that which they considered to be the priorities for the department. In reply, the plaintiff put his suggestions and grievances in a four page single spaced letter sent to Miller, Tucker, and the Board of Supervisors. In October, the plaintiff forwarded an email to the entire department commenting on the department's vehicle policy and calling for a stop to using benefits to "as tools for harassment and intimidation in disciplinary measures." (Defs.' Ex. 21.) In an October 18, 1998 email to defendant Miller and forwarded to defendant Tucker and the Board of Supervisors, the plaintiff indicated that many members of the department and many citizens in the community shared his concerns over serious problems in the department. (Defs.' Ex. 22.)

Dr. Favret issued a report on October 9, 1998. On October 16, 1998, a telephone conference was held in which defendants Favret, Tucker, Miller and Trank participated together with three other county employees. According to Trank, the purpose of the conversation was to provide Dr. Favret with additional details. Dr. Favret revised her initial report by inserting additional facts and amending one recommendation. Defendant Favret initially recommended an effort be made to mend relations between the plaintiff and defendant Tucker but replaced this with a recommendation that professional mediation

by an impartial hearing officer could help the plaintiff accept a resolution. If this were unsuccessful, defendant Favret viewed the plaintiff's ability to function effectively as a police officer within a departmental structure as "seriously compromised." (Pl.'s Ex. F.) In reissuing the report, Dr. Favret dated it October 9, 1998 and did not indicate that this was a revision of the original report.

On October 20, Miller relieved the plaintiff of duty and placed him on administrative leave. In a memo presented to the plaintiff, the defendant indicated that the plaintiff, in his recent email communications, had "acted in an inappropriate and insubordinate manner" toward him and other county officials. (Defs.' Ex. 23.) Defendant Miller stated that in lieu of serious disciplinary action, the plaintiff could obtain appropriate medical/psychological treatment and would undergo a follow-up evaluation with Dr. Favret. After conducting this follow-up visit. Dr. Favret issued a report on November 25, 1998, in which she recommended that a "specific written agreement might be developed that addresses the process for [the plaintiff] to pursue his concerns." (Pl.'s Ex. G.)

According to the county defendants, the plan of assistance emerged out of this recommendation. Defendant Trank sent a draft of the plan of assistance to the plaintiff's attorney and on December 30, 1998, the plaintiff and his attorney met with defendants Miller, Rhoads and Trank as well as with Lieutenant Newton. The plaintiff was told that he could return to work in as much as he agreed to abide by the terms and conditions contained in the plan. Paragraph one of the plan reads as follows:

> That you shall at all times refrain from any verbal or written communications to third parties, including but not limited to county employees, relating to your employment that are in any way critical or negative towards the county executive, the chief of police or other police department management or command staff, or any other county official or employee. (Def.'s Ex. G.)

The plaintiff maintains that he saw no option but to agree to return to work under these conditions and that he ceased speaking up about ongoing problems in the department including, *inter alia,* racial and sexual favoritism in the admission process, sexual harassment, and unwarranted citizen privacy invasions. (Compl. at 8 ¶ 38.) The defendants contend that this condition was never intended to apply to protected speech and that this was explained to the plaintiff. The court is in the unusual position of being able to examine in detail the conversation of that day as the plaintiff secretly recorded this meeting, as well as others, and it is part of the record of the case.

On April 19, 2000, the plaintiff sued the defendants in the Circuit Court for the City of Charlottesville. The defendants removed the case to this court on May 19, 2000. The complaint originally set forth five causes of action, however, only two counts remain at the summary judgment stage of proceedings.[1] Count One alleges a federal § 1983 claim against all defendants, based on violations of the First Amendment to the United States Constitution, and Count Four alleges a state law claim for actual and constructive fraud against all defendants, except Dr. Favret. The plaintiff seeks compensatory and punitive damages, and a declaration that his constitutional rights were violated.

---

1. The court addressed many of these counts when it took up the defendants' motion to dismiss in its Memorandum and Opinion issued December 20, 2000. *See Mansoor v. County of Albemarle, et al.,* 124 F.Supp.2d 367 (W.D.Va.2000).

The parties filed cross motions for summary judgment. The plaintiff maintains that the language of the plan is an unconstitutional infringement on his protected speech. The county[2] and county defendants, in addition to arguing that the First Amendment jurisprudence weighs in their favor, proffer waiver, standing,[3] and qualified immunity as grounds for summary judgment. Defendant Favret argues that the record lacks sufficient evidence to link her to the plan of assistance. The court referred the motions for proposed findings of fact and a recommended disposition to the presiding United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B). The Magistrate Judge recommended granting summary judgment for plaintiff against the county and county defendants on the First Amendment claim, granting summary judgment for Dr. Favret on the First Amendment claim, and granting summary judgment for the county defendants on the fraud claim.

The parties filed timely objections to the Report and Recommendation pursuant to Federal Rule of Civil Procedure 72.[4] The case is now before the court, which reviews *de novo* those portions of the report or specified proposed findings or recommendations as to which objection was made. *See* 28 U.S.C. § 636(b)(1) (West 1993 & Supp.2000); Fed.R.Civ.P. 72(b).

**2.** The county was inadvertently omitted from the defendants' motion for summary judgment. The court hereby grants the defendants' November 5, 2001 motion to include the county in their original motion for summary judgment.

**3.** The court originally addressed the defendants' standing argument in its Order of October 20, 2000. The defendants have again raised their argument that the plaintiff has no standing to bring this suit as grounds for summary judgment. As the court finds nothing new in the defendants' argument to war-

## II.

A party is entitled to summary judgment when the pleadings and discovery show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[S]ummary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 279 (4th Cir.2000) (quoting *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 356, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)). If the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party, then there are genuine issues of material fact. *See* 477 U.S. at 248, 106 S.Ct. 2505. All facts and inferences shall be drawn in the light most favorable to the non-moving party. *See Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.,* 202 F.3d 223, 227 (4th Cir. 2000).

## III.

 As this court previously discussed in its December 20, 2000 Opinion, 42 U.S.C. § 1983 "provides 'a method for vindicating federal rights elsewhere conferred.'" *Kendall v. City of Chesapeake,* 174 F.3d 437, 440 (4th Cir.1999) (quoting

rant a re-examination of the issue, the court relies on the reasoning and findings in its October 20, 2000 Order, in which it rejected the defendants' arguments and found the plaintiff has standing to bring this claim.

**4.** On January 7, 2002, the plaintiff also filed a "Motion for Leave to File Affidavit." In response, the county defendants argue that it is irrelevant. The court grants the plaintiff's motion and as such, the affidavit from the plaintiff, Pl.'s Ex. VV, is deemed to be part of the record.

*Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)). The First Amendment confers the federal right to "the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment makes this right applicable to the states. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 246 (4th Cir.1999). A public employee "does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citing *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). In particular, a public employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Id.* at 142, 103 S.Ct. 1684. Nevertheless, the state does have recognized "interests as an employer in regulating the speech of its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. The Supreme Court in *Pickering* called on courts to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* When a facial challenge is made to a rule, policy or regulation that restrains protected speech before it occurs, as opposed to a challenge to a *post hoc* disciplinary action, the government's burden is greater, and it must demonstrate that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *United States v. National Treasury Employees Union,* 513 U.S. 454, 468, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) [hereinafter *NTEU* ] (holding that a section of the Ethics Reform Act that banned receipt of honoraria by government employees violated the First Amendment).

## A.

A court conducting the *Pickering/NTEU* analysis must first determine whether the speech at issue involves that of a private citizen speaking on matters of public concern. *See Urofsky v. Gilmore,* 216 F.3d 401, 406 (4th Cir.2000). To make this determination, a court examines the content, context and form of the speech at issue. *See id.* If protected speech is at issue, the court moves on to balance the competing interests of the public employee and the public employer, as discussed above. Both issues are questions of law to be resolved by the court "exercising independent judgment in application of first amendment principles." *Berger v. Battaglia,* 779 F.2d 992, 998 (4th Cir.1985); *see also Urofsky,* 216 F.3d at 406.

■ The plaintiff argues that the text of the plan of assistance, upon which his continued employment was conditioned, contains an unconstitutional prior restraint on his First Amendment right to free speech. The county and county defendants contend that it was understood by those present at the December 30, 1998 meeting that this plan would not apply where protected speech was at issue.

The relevant section of the plan of assistance reads as follows:

That you shall at all times refrain from any verbal or written communications to third parties, including but not limited to county employees, relating to your employment that are in any way critical or negative towards the county executive, the chief of police or other police department management or command staff, or any other county official or employee.

(Def.'s Ex. G.) As this court found in its December 20, 2000 Opinion, *see* 124

F.Supp.2d 367, 376 (W.D.Va.2000), the restraint, with its sweeping language, necessarily includes matters of public concern relating to employment upon which the plaintiff could speak in his capacity as a private citizen. However, the county defendants argue that the tape recording of the meeting, which came to light during discovery, reveals that defendant Miller clearly and expressly told the plaintiff that the plan did not impose a restriction on his right to speak as a private citizen. The county defendants stress that defendant Miller's remarks were not a modification but a clarification of the scope of the plan. Defendant Miller replied to a question from the plaintiff about his rights as a private citizen with the following answer:

> Certainly, anything dealing with a departmental matter, it falls within the area of the first amendment and what is a public concern, that area that as a private citizen or not. If you're criticizing the department and it doesn't fall within a public concern, then it looks like a personal vendetta or a criticism that's unlawful, then you don't have that right. And I think probably Stephanie [the plaintiff's attorney] would be best to explain that to you.

(Miller Aff. Ex. 21.) Clear and express are not the adjectives this court would choose in describing these remarks, and anything less than that is unacceptable under these circumstances. The county defendants were presenting the plaintiff with the conditions under which he could return to work. Moreover, these conditions unquestionably imposed limits on the speech of the plaintiff. Given the existence of a full panoply of case law replete with admonitions for employers to draw careful boundaries when restricting employees' speech, the court would hope that every government employer could see the red flag raised by these circumstances. *See e.g., Urofsky,* 216 F.3d at 408–409 (finding that the language of a Virginia

statute restricting state employees from accessing sexually explicit material on state computers clearly implicated only speech made in the employee's role as employee); *Zook v. Brown,* 865 F.2d 887, 892 (7th Cir.1989) (finding a standard regarding advertisements by police officers was not so broadly worded as to grant unfettered enforcement discretion); *Cf. Kessler v. City of Providence,* 167 F.Supp.2d 482, 487 (D.R.I.2001) (finding that a police regulation prohibiting officers from speaking to the public on department matters was not narrowly drawn and violated the First Amendment) *and Salerno v. O'Rourke,* 555 F.Supp. 750, 758 (D.N.J. 1983) (finding a rule prohibiting but not defining "disparaging remarks" and proscribing dissemination of "all information" by anyone but the Sheriff were facially over inclusive and left no room whatsoever for legitimate exercise of free speech in areas of public concern). However, rather than drafting a narrowly tailored, precise document to set forth the requirement that the plaintiff take employment-related complaints and grievances through the proper channels, the county employer instead drafted a clause which could potentially prohibit the plaintiff from telling his spouse about his day. Therefore, the court is not persuaded that Captain Miller's verbal explanation clarified the meaning of the written plan.

The meaning of defendant Miller's remarks is hardly clear. Is it that any departmental matter is protected by the First Amendment; or perhaps, that unlawful criticism is not protected; or is it, indeed, that departmental matters of public concern addressed as a private citizen are protected? Defendant Miller essentially provides the plaintiff with a multiple choice answer and with the advice that he is better off consulting his attorney to determine the meaning of the conditions

by which he must abide in order to keep his job.

Furthermore, as the Magistrate Judge noted, remarks made later in the December 30, 1998 meeting demonstrate that the plaintiff was to concentrate on what was in writing and not on what was said. Namely, Chief Miller concluded the meeting with the assertion that the plan would eliminate any further mixed signals or miscommunications because what the plaintiff could and could not do had now been reduced to writing. (Miller Aff. Ex. 21.) Thus, the county defendants told the plaintiff to rely on the writing to understand what he could and could not do, but they now tell the court to rely on defendant Miller's comments to determine when the plan does and does not apply. The court finds that this inconsistency further contributes to the general sense of confusion that surrounds the plan and its purpose and does nothing to change the clear meaning of the language of the plan itself.

Accordingly, in the court's independent judgment, after reviewing the form, content and context of the language at issue, the plan of assistance does restrict speech by the plaintiff in his capacity as a citizen upon matters of public concern.

### B.

■ Having found that the prior restraint encompasses protected speech, the court must now determine whether the county employer was justified in imposing this ban on the plaintiff. The Magistrate Judge recommends that the court find that the balance of interests weighs in favor of the plaintiff. The county defendants, however, contend that the *Pickering* balancing test should be resolved in their favor.

As the court discussed above, the county employer bears a greater burden when trying to justify a prior restraint, or an *ex ante* restriction, on speech than when defending a *post hoc* action taken in response to speech already spoken. *See Latino Officers Association v. City of New York*, 196 F.3d 458, 463 (2d Cir.1999); *Milwaukee Police Association v. Jones*, 192 F.3d 742, 749–50 (7th Cir.1999) (citing *NTEU*, 513 U.S. at 467–68, 115 S.Ct. 1003). Thus, in a First Amendment retaliation claim, the court balances " 'the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *See Connick*, 461 U.S. at 142, 103 S.Ct. 1684 (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731). Meanwhile in a prior restraint analysis, the government must also demonstrate that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Milwaukee Police Assoc.*, 192 F.3d at 750 (quoting *NTEU*, 513 U.S. at 468, 115 S.Ct. 1003.) In explaining this higher burden, the Supreme Court noted the widespread impact of a general ban and its chilling effect on potential speech. *See NTEU*, 513 U.S. at 468, 115 S.Ct. 1003.

The facts of this case do not fit neatly into either paradigm. The plan of assistance is an individual action which emerged out of concerns the county employer developed in part due to communications which the plaintiff had already made. Within this plan is a forward reaching prior restraint on the plaintiff's protected speech which "chills potential speech instead of merely punishing actual speech already communicated." *Milwaukee Police Assoc.*, 192 F.3d at 750. Thus, the plaintiff's interest is not determined by looking at his past speech, but at the value of his future speech. Because this court has found that the plaintiff would be prohibited from speaking as a citizen on mat-

ters of public concern, this interest must be given significant weight. While the court believes it proper to hold the county employer to a higher burden in defending their action, the court finds that the defendants lose even under the *Pickering* balancing test. *See* 391 U.S. at 568, 88 S.Ct. 1731 (asking whether the speech impeded proper performance or interfered with regular operations in determining the government's interest in promoting efficiency). Courts, in applying the *Pickering* standard, have elaborated on what promoting efficiency entails for a government employer. *See e.g., Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 354 (4th Cir.2000) (balancing the employee's interest against the "employer's responsibility to manage its internal affairs and provide 'effective and efficient' service to the public," in particular, to avoid significant disruption) (quoting *Daniels v. Quinn*, 801 F.2d 687, 690 (4th Cir.1986)); *Berger v. Battaglia*, 779 F.2d 992, 1000 (4th Cir. 1985) (asking if there was direct disruption, by the speech, of the public employer's internal operations and employment relationships). A common thread is the prevention of direct disruption in the workplace.

The county defendants argue that they imposed this plan of assistance in the interest of halting further insubordination and disruptions caused by the plaintiff. They further point out that police departments have been accorded greater deference in such situations than that which an ordinary government employer might receive. *See Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir.1999) (finding it appropriate to give more latitude to a public safety employer's determinations of the potential for disruption and to their response to disruption). Moreover, the county defendants state that it is critical to a functioning police department that an employee have the ability to work within the chain of command.

The problem with the county defendants' argument is that the record fails to reflect any direct disruption caused by the plaintiff. Indeed, upon returning to work after his medical leave, the plaintiff received a letter of appreciation for his professional response to a local burglary, (Pl.'s Ex. FF), demonstrating that his proper performance was not impeded. The plaintiff's immediate superior, Sergeant Beth Barden, also stated that she was "never aware of any disruption to the operation of the Department by anything [the plaintiff] did or said..." (Pl.'s Ex. C.)

The record supports the plaintiff's claim that he received mixed messages about his alleged failure to comply with the proper chain of command. In his response to the plaintiff's April 20 letter, which sparked concerns in Miller over the plaintiff's fitness for duty, defendant Miller, rather than reprimanding the plaintiff for insubordination, addressed his concerns and wrote both that the plaintiff should utilize the established reporting procedure and that the plaintiff should contact him or Rhoads directly if future incidents occur. (Pl.'s Ex. OO.) Defendant Miller also confirmed, in the December 30, 1998 meeting, that he had told the plaintiff to send his lengthy response to the department's priority questionnaire to the Board of Supervisors, although the defendants rely on this incident to show the plaintiff's disregard of the chain of command.

The defendant bears the burden of showing that the recited harms are real and not speculative. *See Latino Officers Assoc.*, 196 F.3d at 463; *see also Goldstein*, 218 F.3d at 355 (holding that "generalized and unsubstantiated allegations of 'disruptions,' and predictions thereof" do not outweigh the plaintiff's interest). The county defendants have failed to meet this burden. No disruption can be discerned from the record. Moreover, concerning insub-

ordination for failure to observe the chain of command, the instructions given to the plaintiff were far less clear than the county defendants present them.

Thus, the court cannot find that the balance of interests weighs in the defendants' favor. The interest of the county employer in imposing a prohibition on all the plaintiff's future employment-related speech, which includes matters of public concern raised as a private citizen, does not outweigh the plaintiff's interest in that protected speech. Accordingly, the court finds that the county employer imposed a condition which impermissibly restricted the plaintiff's First Amendment rights.

The court wants to make clear that it is not finding that the plaintiff's prior speech necessarily fell into the protected speech category. Indeed, an examination of the record reveals that many of the issues raised by the plaintiff in his letters, email and conversations either were not matters of public concern, such as pay scales, vehicle take home policies, and his personal overtime hours, or they were not made by the plaintiff as a private citizen, but as an employee. Likewise, the court with these findings intends in no way to condone the plaintiff's conduct. Thus, the court today finds only that any terms and conditions imposed on the plaintiff's future speech must make it clear that he retains his right to speak as a private citizen on matters of public concern.

### C.

Having found that the plan of assistance represents an impermissible infringement on the plaintiff's First Amendment rights, the court shall now address the issue of individual liability. The defendants object that the Magistrate Judge did not address the motions of the individual county defendants and failed to identify any evidence showing each of the specific defendants contributed to the deprivation of the plaintiff's First Amendment rights.

■ The court will begin with Dr. Favret. The Magistrate Judge recommended that summary judgment be granted in her favor. The plaintiff objects and states that the doctor was part of a conspiracy to deprive him of his First Amendment rights, and that she carefully tailored her reports to assist the county in doing so. The plaintiff relies mainly on the existence of two "October 9" reports issued by Dr. Favret. The second, and according to the plaintiff, the more derogatory report, emerged after a telephone conference, with, among others, the county defendants Tucker, Miller and Trank. The county defendants explain that the purpose of the conversation was to provide further facts to defendant Favret. The court does not find sufficient evidence in the record to support the plaintiff's sinister portrayal of the conversation. Certainly, the evidence falls short of the specific circumstantial evidence that the plaintiff is required to provide when claiming the existence of an agreement to deprive him of his constitutional rights. *See Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 421 (4th Cir.1996) *and Hafner v. Brown*, 983 F.2d 570, 576 (4th Cir.1992) ("A civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict the harm or injury upon another, and an overt act that results in damages.'" (internal citations omitted)). While Dr. Favret's follow-up evaluation recommended that a specific written agreement might be drafted to address the process for the plaintiff to pursue his concerns, the plaintiff produces no evidence that Dr. Favret ever discussed or saw the actual plan of assistance or played a role in drafting it. The

plaintiff fails to draw the connection between a recommendation which would aid the plaintiff in keeping his job and a clause in the plan of assistance which infringes on the plaintiff's First Amendment protected speech. As such, the court finds that the plaintiff's inferences rest on a basis too dubious to hold defendant Favret liable.

Indeed, among the individual county defendants, only defendants Miller, Rhoads and Trank appear linked to the plan of assistance containing the problematic language at issue in this suit. It is not disputed that all three were involved in either the preparation or the presentation of the plan to the defendant. As for the other county defendants, defendant Tucker's main connection to the conspiracy, according to the plaintiff, was his participation in the telephone conference with Dr. Favret. As the court noted above, the record does reflect that such a conversation took place. However, the record also supports the county defendants' representations that they aimed to provide Dr. Favret with more facts related to the plaintiff and his interactions with Tucker. The court finds that the second October 9 report was a more factually detailed psychological evaluation of the plaintiff. The plaintiff has also not produced any evidence to contradict defendant Tucker's own assertions that he had not been aware of the contents of the plan of assistance until this litigation. (Tucker Aff. ¶ 6.)

Likewise, defendant Davis' connection to this litigation is elusive. The record indicates that on October 13, 1998, he did receive a handwritten memo by defendant Trank concerning Dr. Favret's report. (Pl.'s Ex. AA.) In addition, he responded to the plaintiff's attorney in a letter dated October 11, 1999, in which he reiterated that the plan of assistance remains in effect. (Pl.'s Ex. Q.) However, this evidence is insufficient to hold defendant Davis responsible for taking part in a plot to produce the plan of assistance itself.

Accordingly, the court grants the plaintiff's summary judgment motion on his First Amendment claim with respect to the county and county defendants Miller, Rhoads and Trank, to the extent that the court declares the prior restraint contained in the plan of assistance unconstitutional.[5] The court denies the plaintiff's summary judgment motion with respect to county defendants Tucker and Davis and with respect to defendant Favret. The motions of county defendants Tucker and Davis for summary judgment on the First Amendment claim are granted as is the summary judgment motion of Dr. Favret.

### IV.

In as much as the court has found that the plan of assistance infringes on constitutionally protected speech, the county defendants contend that the plaintiff waived his First Amendment rights upon agreeing to abide by the plan. The county defendants maintain that because the plaintiff was given an opportunity to confer with counsel and to ask questions during the meeting, and because the plaintiff requested no revision to the text of the plan, he knowingly and voluntarily waived his right to challenge it. The Magistrate Judge recommended that the court reject this argument.

The defendants rely on *Lake James Community Fire Department, Inc. v. Burke County,* 149 F.3d 277 (4th Cir.1998), to support their contention that it is possible to waive a constitutional right. In that case, the Fourth Circuit upheld an agreement made by a volunteer fire department not to sue a county although it involved a waiver of the First Amendment right to petition the government.

---

5. The issue of damages is addressed in section VII of this Opinion.

■ The Fourth Circuit held that a contractual waiver of a constitutional right is permissible when it is knowingly and voluntarily given, and when enforcing the waiver does not undermine the relevant public interest. 149 F.3d at 280. However, as the Magistrate Judge correctly points out, the *Lake James* court focused on the limited nature and narrowly-tailored language of the waiver in that case. *See id.* at 281 ("Only to the extent that the Fire Department agreed to consent to the citizens' petitions did the Fire Department waive its right to sue.") The Fourth Circuit also observed that the Fire Department had not given away anything that it had prior to entering into the contract. *See id.* In contrast, there is nothing limited about the waiver that the defendants ask this court to accept, namely, that the plaintiff waived his First Amendment right to speak as a private citizen on matters of public concern related to his employment. Moreover, the plaintiff unquestionably had these rights prior to being presented with the plan of assistance. Finally, serious public policy concerns arise on the question of waiver in this case, particularly, when the law is clear that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick*, 461 U.S. at 142, 103 S.Ct. 1684.

For these reasons, the court rejects waiver as a basis for granting the defendants' summary judgment motions.

### V.

■ In addition to the First Amendment claim, the plaintiff also has a fraud claim against the individual county defendants. A claim of actual fraud requires plaintiff to prove "a false representation of a material fact, made intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting damage." *ITT Hartford Group, Inc. v. Virginia Financial Assocs. Inc.,* 258 Va. 193, 520 S.E.2d 355, 361 (1999) (internal quotation marks and citations omitted). With constructive fraud, the misrepresentation can be made innocently or negligently, and the plaintiff need only show that his reliance on it resulted in damages. *See id.*

■ The plaintiff argues that defendant Rhoads falsely represented to him that he should submit to an evaluation by Dr. Favret because it might be helpful for his medical reimbursement claim, and that this misrepresentation was never corrected by any of the county defendants. The Magistrate Judge found that the plaintiff's case failed on the reliance element as the evidence demonstrated that the plaintiff was aware that fitness for duty was at the core of the evaluation.

Even accepting the plaintiff's contention as true, namely, that defendant Rhoads told him the reason for the plaintiff's visit to Dr. Favret was to evaluate his medical reimbursement, the plaintiff's own communications establish that he knew fitness for duty was an issue on the table. In a July 17, 1998 email to defendants Miller and Tucker, the plaintiff indicates he received a copy of the letter which defendant Miller sent to the plaintiff's counselor, Dr. Hocking. Among other things, the plaintiff specifically mentions that Miller had requested information from Dr. Hocking both to evaluate the plaintiff's request for reimbursement and to "make a determination as to whether [the plaintiff] continue[s] to be fit for duty as a police officer..." (Pl.'s Ex. LL.) Moreover, at his first meeting with Dr. Favret, the plaintiff signed a release form which stated expressly that this was a fitness for duty evaluation. (Def.'s Ex. D.) The plaintiff rather confusedly objects that reliance on this evidence is misplaced because "fitness for duty" had different meanings to the plaintiff and the defendants. To the plaintiff, it meant a

determination of whether the causes of his panic disorder were work-related, while to the defendants, it meant a method to silence the plaintiff. However, the plaintiff's own email refutes this argument as he recognized that fitness for duty was a reason independent of the reimbursement issue for defendant's Miller inquiry to Dr. Hocking. While the plaintiff can establish that he was told more than one reason for the Favret evaluation, the evidence indicates that he knew that fitness for duty was one of them. As such, the plaintiff's fraud claim fails for lack of genuine issue of material fact, and the court grants summary judgment for the county defendants.

## VI.

Finally, the court shall address the county defendants' renewed defense of qualified immunity. "Qualified immunity protects government officials from civil damages in a § 1983 action 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir.1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). It is a question of law which the court must answer after construing all the facts and inferences in favor of the plaintiff. *See Gordon v. Kidd*, 971 F.2d 1087, 1093–93 (4th Cir.1992). The court must first identify with particularity the right that the plaintiff claims was infringed upon by the county employer. *See Edwards*, 178 F.3d at 251. The next query for the court is whether the right was clearly established. This requires courts to look to decisions of the " 'Supreme Court, this court of appeals, and the highest court of the state in which the case arose....'" *See id.* (quoting *Jean v. Collins*, 155 F.3d 701, 709 (4th Cir.1998))(*en banc*). Lastly, the court must ask whether a "reasonable person in the official's position would have known

that his conduct would violate that right." *Id.*

■■■ The court's findings on the plaintiff's First Amendment claim establish that the plaintiff has alleged the deprivation of an actual constitutional right, the right to speak as a citizen on matters of public concern, and that this right was clearly established at the time of the alleged violation. *See e.g. Connick*, 461 U.S. at 142, 103 S.Ct. 1684 (finding the law clear that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression"); *Pickering*, 391 U.S. at 574, 88 S.Ct. 1731 (noting that "the threat of dismissal from public employment is ... a potent means of inhibiting speech"). Thus, it remains for the court to determine whether a reasonable county official would have known that his conduct violated that right. This objective fact-specific inquiry requires the court to define the clearly established right at the appropriate level of specificity. *See Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Therefore, the court must determine whether the county officials could reasonably have believed that conditioning the plaintiff's continued employment on compliance with a plan which contained a prior restraint on plaintiff's speech, such that it prohibited the plaintiff from speaking in any way negative or critical to any third party at any time about county officials, was lawful, in light of clearly established law.

The county defendants provide multiple, contradictory grounds on which a reasonable county official could believe that his action was lawful. According to the county defendants, a reasonable public official could have believed that the plan infringed no protected rights because of the express

limitation of its terms to matters relating to employment or because of Chief Miller's explanation of the plan. The county defendants further argue that a reasonable public official could have believed that the plaintiff waived his protected First Amendment rights. Finally, the county defendants suggest that a reasonable public official could have believed that the plan would pass the *Pickering* balancing test.

■ The court notes that Chief Miller's subjective beliefs about the propriety of his conduct are irrelevant, as this is an inquiry into whether his actions were objectively reasonable. *See Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir.1994) (citing *Anderson*, 483 U.S. at 641, 107 S.Ct. 3034). Essentially, the defendants argue that they either reasonably believed that they were not violating the plaintiff's rights, or they reasonably believed that they were violating the plaintiff's rights but that it was lawful because of waiver. The worrisome proposition that a county official could thus infringe upon an employee's First Amendment protected speech rights, could declare that the employee waived these rights by returning to work, and then could present this as grounds for qualified immunity, leads the court to reject this option outright. The court shall determine solely whether these county officials could reasonably have believed that the restraint was not unconstitutionally broad.

In the case of a retaliation claim alleging First Amendment violations, where a public employer took action because of an employee's speech, this lawful reasonableness inquiry can favor the public official. *See DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir.1995) (noting where a court has to conduct a subtle balancing test itself to determine whether speech is protected, it may be unfair to ask that a public employer be expected to know a right to a particular type of speech was clearly estab-

lished); *see also Campbell v. Prince George's County Maryland,* 2001 WL 706039 *4 (D.Md.2001)(finding an employer's actions reasonable because it was not clearly established that employee's personal complaints made at work were protected speech). However, as this court has stated elsewhere in this Opinion, at issue here is the imposition of a prior restraint on a broad category of future speech, and thus, no balancing as to the First Amendment value of a specific utterance or conduct is involved. A government official is hardly being called upon to conduct a subtle balancing test when he is deciding whether or not to condition future employment on adherence to a ban on constitutionally protected speech. As this court noted the first time it took up this defense, in its December 20, 2000 Opinion, 124 F.Supp.2d at 379, the individual defendants were "not operating in a murky area of the law." *Doe v. Broderick,* 225 F.3d 440, 453 (4th Cir.2000). As such, the court finds that the defendants reasonably should have known that the broad language of the prior restraint imposed unconstitutional limitations on the plaintiff's protected speech. To put it another way, the court finds that the defendants' belief that the plan of assistance was not an unconstitutional prior restraint was objectively unreasonable. The defendants' motion for summary judgment on qualified immunity grounds is denied.

### VII.

As the court has found in favor of the defendants on the plaintiff's fraud claim, the court is left with the issue of what damages, if any, are appropriate for its holding that the prior restraint infringed on the plaintiff's First Amendment rights. The plaintiff seeks a declaration that the plan of assistance was unconstitutional and an award of "presumed damage" in an amount of $100,000.00 "given the impor-

tance of the constitutional right infringed and the length of time the right has been infringed." (Pl.'s Mem. Supp. Summ. J. Mot. at 42.) As that is the extent of the plaintiff's presentation of damages and the county defendants simply did not address the issue, the court shall reserve decision pending receipt from the parties of briefs on the issue of an appropriate award of damages and after conducting a hearing.

## VIII.

For the foregoing reasons, the court accepts the Magistrate Judge's recommendation to the extent that it grants the plaintiff's summary judgment motion on his First Amendment claim with respect to the county and the individual county defendants Miller, Rhoads and Trank, with the subject of damages reserved for later consideration. As such, the court declares the prior restraint contained within the plan of assistance unconstitutional. The court grants the summary judgment motions of defendants Tucker and Davis on the First Amendment claim, thereby rejecting the Magistrate Judge's recommendation. The court further grants defendant Favret's motion for summary judgment on the plaintiff's First Amendment claim as well as the summary judgment motions of the individual county defendants on the fraud claim.

Finally, the court grants the plaintiff's January 7, 2002 "Motion for Leave to File Affidavit" and the county defendants' November 5, 2001 "Motion to Amend County Defendants' Motion for Summary Judgment." The plaintiff's motion to strike the affidavit of Mark Trank, filed October 9, 2001, is denied, and defendant Favret's motion to compel, filed November 5, 2001, is withdrawn.

An appropriate Order this day shall issue.

## ORDER

Before the court is the presiding United States Magistrate Judge's December 6, 2001 Report and Recommendation on the parties' cross motions for summary judgment. The parties have filed objections and responses thereto. Accordingly, the court has performed a *de novo* review of the Magistrate Judge's Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). Upon thorough consideration of the Report and Recommendation, all relevant memoranda of the parties, the entire record, and the applicable law, and for the reasons stated in the accompanying Memorandum Opinion, it is accordingly this day

## ADJUDGED, ORDERED, AND DECREED

as follows:

1. The Magistrate Judge's Report and Recommendation, filed December 6, 2001, shall be, and it hereby is, ACCEPTED IN PART and REJECTED IN PART;

2. The county defendant's objections, filed December 19, 2001, shall be, and they hereby are, SUSTAINED IN PART and OVERRULED IN PART;

3. The plaintiff's objections, filed on December 17, 2001, shall be, and they hereby are, OVERRULED;

4. The county defendants' "Motion to Amend Motion for Summary Judgment," filed November 5, 2001, shall be, and it hereby is, GRANTED;

5. The plaintiff's motion for summary judgment, filed October 9, 2001, shall be, and it hereby is, GRANTED IN PART in that the court grants summary judgment against the county and county defendants Miller, Rhoads and Trank with respect to the First Amendment claim AND DENIED IN PART in that the court denies summary judgment against county defen-

dants Davis and Tucker and defendant Favret. The issue of damages is reserved pending receipt of further briefs from the parties. The plaintiff's motion for summary judgment on the fraud claim is DENIED.

6. The county and county defendants' motion for summary judgment, filed October 9, 2001, shall be, and it hereby is, GRANTED IN PART in that the court grants summary judgment on the First Amendment claim for the county defendants Davis and Tucker AND DENIED IN PART on the First Amendment claim as to the county and county defendants Miller, Rhoads and Trank. The county defendants' motion for summary judgment on the fraud claim is GRANTED.

7. Defendant Favret's motion for summary judgment, filed October 9, 2001, shall be, and it hereby is, GRANTED.

8. The plaintiff's motion to strike the affidavit of Mark Trank, filed October 9, 2001, shall be, and it hereby is, DENIED.

9. The plaintiff's motion for leave to file an affidavit, filed January 7, 2002, shall be and it hereby is, GRANTED.

10. Defendant Favret's motion to compel, filed November 5, 2001, shall be, and it hereby is, WITHDRAWN, upon the motion of defendant Favret, filed November 2, 2001.

The Clerk of the Court is directed to send a certified copy of this Order and the accompanying Memorandum Opinion to all counsel of record and to Magistrate Judge Crigler.