**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KARL MANSOOR,
　　　　　　*Plaintiff-Appellee,*

　　　　v.

MARK TRANK, Counsel for the
County of Albemarle in his official
and individual capacity; JOHN
MILLER, Chief of the Albemarle
County Police Department, in his
official and individual capacity;
RICHARD DOUGLAS RHOADS, Captain
of the Albemarle County Police
Department, in his official and
individual capacity,
　　　　　*Defendants-Appellants,*

　　　　and

COUNTY OF ALBEMARLE, VIRGINIA;
ROBERT M. TUCKER, Administrator
of the County of Albemarle, in his
official and individual capacity;
LARRY DAVIS, Counsel for the
County of Albemarle, in his official
and individual capacity; CYNTHIA
FAVRET, in her individual capacity,
　　　　　　　　*Defendants.*

THE THOMAS JEFFERSON
CENTER FOR THE PROTECTION OF FREE
EXPRESSION,
　　　*Amicus Supporting Appellee.*

No. 02-1277

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.
James H. Michael, Jr., Senior District Judge.
(CA-00-47-3)

Argued: December 5, 2002

Decided: February 4, 2003

Before WILKINS and MOTZ, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Wilkins and Senior Judge Hamilton joined.

---

**COUNSEL**

**ARGUED:** Mark Dudley Obenshain, KEELER OBENSHAIN, P.C.,
Harrisonburg, Virginia, for Appellants. Neal Lawrence Walters,
SCOTT & KRONER, P.C., Charlottesville, Virginia, for Appellee.
**ON BRIEF:** Deborah C. Wyatt, WYATT & ASSOCIATES, P.L.C.,
Charlottesville, Virginia; Barbara S. Jenkins, JENKINS & RHEA,
P.L.C., Charlottesville, Virginia, for Appellee. Robert M. O'Neil, J.
Joshua Wheeler, THOMAS JEFFERSON CENTER FOR THE PRO-
TECTION OF FREE EXPRESSION, Charlottesville, Virginia, for
Amicus Curiae.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Karl Mansoor, a police officer in Albemarle County, Virginia,
brought this § 1983 action against the County and six individuals,
contending that they conspired to deprive him of his First Amendment
free speech rights. *See* U.S. Const. amend. I; 42 U.S.C.A. § 1983

(West Supp. 2002). All individual defendants moved for summary judgment, *inter alia*, on qualified immunity grounds. The district court refused to grant summary judgment to three of the six individuals; they now bring an interlocutory appeal. *See Behrens v. Pelletier*, 516 U.S. 299 (1996). We affirm.

### I.

Most of the relevant facts are undisputed in this case. However, to the extent there are factual disputes, when considering an interlocutory appeal of a denial of qualified immunity, we are required to consider the facts, "in the light most favorable to the party asserting the injury," in this case, Mansoor. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Mansoor began work for the Albemarle County Police Department in 1994 and regularly received above-average performance reviews. Beginning in 1997, Mansoor began to express complaints about various department policies, ranging from a proposed pay plan to lack of overtime opportunities. Mansoor alleges that department officials responded negatively to his criticisms, creating a stressful working environment. Mansoor further alleges that the stress and pressure from his workplace resulted in extreme anxiety, profuse sweating, and shortness of breath. Early in 1998, Mansoor sought treatment from a private counselor, Dr. Hocking, who diagnosed him with panic disorder. At the recommendation of the doctor, Mansoor took a forty-day medical leave beginning in March 1998.

Although Police Chief John Miller permitted Mansoor to return to work, the Chief claims that he maintained doubts about Mansoor's fitness for duty. At Miller's request, Mansoor met with a psychologist, Dr. Favret, for an evaluation. In a document dated Oct. 9, 1998, Dr. Favret reported her initial findings about Mansoor. A week later, Dr. Favret, Chief Miller, Mark Trank, the County's counsel, and four other county employees participated in a telephone conference. Following this conference, Dr. Favret amended her report and reissued it, still dated Oct. 9, 1998, without indicating that it was a revision of the original report.[1]

---

[1]The parties dispute the nature of the telephone conference, and of the changes made by Dr. Favret. However, resolution of this factual dispute does not affect the outcome of this appeal.

On October 20, Miller relieved Mansoor of duty and placed him on administrative leave, assertedly because of Mansoor's "impaired judgment and related behavior." Miller told Mansoor that he must meet three conditions in order to return to his position: (1) demonstrate appropriate medical treatment; (2) undergo a follow-up evaluation by Dr. Favret; and (3) demonstrate the ability "to function effectively within the Department, that you are ready, willing, and able to abide by management policies and decisions . . . ."

In November, Mansoor met with Dr. Favret for a second evaluation. In her report from this meeting, Dr. Favret suggested that if Mansoor "is to be given the opportunity to return to work, a specific written agreement might be developed that addresses the process for him to pursue his concerns." After receiving Dr. Favret's second report, a Plan of Assistance (the "Plan") was created for Mansoor, and on December 29 faxed to Mansoor's attorney, Stephanie Blythe. The Plan establishes terms and conditions for Mansoor's return to work, stating:

> I [Miller] have determined that you [Mansoor] will be allowed to return to duty on the following terms and conditions:
>
>> 1. That you shall at all times refrain from any verbal or written communications to third parties, including but not limited to county employees, relating to your employment that are in any way critical or negative towards the county executive, the chief of police or other police department management or command staff, or any other county official or employee. . . .

On December 30, Mansoor and Blythe met Miller, Trank, and Captain Richard Rhoads (the "Appellants"), along with Lieutenant Newton, to discuss the Plan and Mansoor's return to work. This meeting was tape recorded. The tape reveals that Chief Miller began the December 30 meeting by stating that he wanted Mansoor to understand that Miller's decisions are final and not to be questioned. Miller said that "using e-mail to blast my decisions, or things that I've done or not done, will not be tolerated."

Later in the meeting, Mansoor asked, "How 'bout my rights as a private citizen; if I want to make statements to anybody else, so I'm asking you about that." Miller responded:

> As a private citizen you have the right. Certainly, anything dealing with a departmental matter, it falls within the area of the First Amendment and what is a public concern, that area that that as a private citizen or not. If you're criticizing the department and it doesn't fall within a public concern, then it looks like a personal vendetta or a criticism that's unlawful, then you don't have that right. And I think probably Stephanie [Mansoor's attorney] would be best to explain that to you.

Toward the end of the meeting, in response to a comment by Mansoor that he had been receiving mixed signals from the department regarding his complaints, Miller replied, "Well, that's why I think it's good that this is in writing . . . . If there's any miscommunication, it's at least in writing . . . . Now there's no question as to what you can and cannot do."

Mansoor returned to work shortly after the December 30 meeting, but he maintains that the conditions of employment placed on him by the Plan unconstitutionally punished him for earlier complaints and operated as a prior restraint on his First Amendment rights. Appellants respond that the Plan was designed to curb the disruption caused by Mansoor's inappropriate complaints and insubordination, and to provide Mansoor with the type of guidelines that psychologists had suggested would be helpful for him.

In April 2000, Mansoor filed suit in state court alleging five causes of action. After Appellants removed the case to federal court, the district court dismissed three of the five claims, leaving Mansoor's First Amendment § 1983 claim and a fraud claim. The district court then granted summary judgment to all defendants on the fraud claim and to all defendants, except Miller, Rhoads, and Trank, on Mansoor's First Amendment claim. Miller, Rhoads, and Trank then filed this

interlocutory appeal of the district court's judgment denying them
qualified immunity on Mansoor's First Amendment claim.**²**

II.

We analyze entitlement to qualified immunity in two steps. First,
we must determine whether, "taken in the light most favorable to the
party asserting the injury, . . . the facts alleged show [that] the offi-
cer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at
201. Second, we decide "whether the right was clearly established" at
the time of the events at issue. *Id.*

In *Urofsky v. Gilmore*, 216 F.3d 401 (4th Cir. 2000) (*en banc*), we
recently explained the legal principles governing the First Amend-
ment rights of public employees:

> It is well settled that citizens do not relinquish all of their
> First Amendment rights by virtue of accepting public
> employment. . . . A determination of whether a restriction
> imposed on a public employee's speech violates the First
> Amendment requires a balance between the interests of the
> employee, as a citizen, in commenting upon matters of pub-
> lic concern and the interest of the State, as an employer, in
> promoting the efficiency of the public services it performs
> through its employees. This balancing involves an inquiry
> first into whether the speech at issue was that of a private
> citizen speaking on a matter of public concern. If so, the
> court must next consider whether the employee's interest in
> First Amendment expression outweighs the public employ-

---

**²**The district court also granted summary judgment *to* Mansoor on his
First Amendment § 1983 claim, but reserved the award of damages pend-
ing a hearing. Accordingly, the court's decision granting summary judg-
ment to Mansoor is not yet final, *see, e.g.*, *LeBoeuf, Lamb, Greene, &
MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999) (holding
judgment "non-final because the district court had yet to award dam-
ages"); *see also* 19 James Wm. Moore et al., *Moore's Federal Practice*
§ 201.10[2] (3d ed. 1999) (noting that to be final for purposes of appel-
late jurisdiction, the judgment must describe the relief to which the pre-
vailing party is entitled), and therefore not properly before us.

er's interest in what the employer has determined to be the appropriate operation of the workplace.

*Id.* at 406 (internal alterations and quotation marks omitted) (citing *United States v. Nat'l Treasury Employees Union (NTEU)*, 513 U.S. 454, 465 (1995); *Connick v. Myers*, 461 U.S. 138, 142 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)). When applying this *Pickering* balancing test, the Supreme Court has suggested that "the Government's burden is greater" in cases like that at hand, involving "potential speech before it happens" than in cases involving "an adverse action taken in response to actual speech." *NTEU*, 513 U.S. at 468.

The district court identified these governing principles and applied them to hold that Mansoor had offered evidence sufficient to prove that the terms of the Plan operated as a prior restraint on his well-established First Amendment right to speak as a private citizen on matters of public concern, and thus concluded that the officers were not entitled to qualified immunity. *See Mansoor v. County of Albemarle*, 189 F. Supp. 2d 426, 432-34, 440-41 (W.D. Va. 2002). Appellants offer several arguments as to why the district court erred in so holding. We address these arguments in turn.[3]

---

[3]We note at the outset that the parties also dispute at some length whether Mansoor's earlier criticisms of the department constitute matters of public concern, and whether the department had an interest in preventing a disruption that this assertedly unprotected speech might have caused. We need and do not reach these questions because the district court rested its ruling, and we rest ours, on resolution of a quite different question:

> whether the county officials could reasonably have believed that conditioning the plaintiff's continued employment on compliance with a plan which contained a prior restraint on plaintiff's speech, such that it prohibited the plaintiff from speaking in any way negative or critical to any third party at any time about county officials, was lawful, in light of clearly established law.

*Mansoor*, 189 F. Supp. 2d at 440.

A.

With respect to the first prong of the qualified immunity analysis, Appellants contend that the Plan's limitation on future communications "relating to your employment" renders it constitutional. This could only be so, however, if the limiting phrase, "relating to your employment," had to be interpreted to cover only matters *not* of public concern. But, in fact, matters "relating to your employment" clearly *can* encompass matters of public concern. For example, the Plan apparently would restrict Mansoor's right to speak about perceived racial problems within the department, a right we have explicitly held to be of public concern. *See Cromer v. Brown*, 88 F.3d 1315, 1325-26 (4th Cir. 1996). Indeed, Appellants conceded at oral argument that the district court correctly noted that "there are matters which can relate to your employment which also relate to matters of public interest."

Appellants also argue that Chief Miller made it clear at the December 30 meeting that the Plan did not refer to Mansoor's statements as a private citizen. They maintain that Mansoor admitted at deposition that Chief Miller explained that Mansoor would retain his rights to speak as a private citizen. This argument fails for several reasons. First, since there is no ambiguity in the terms of the Plan, Miller's oral statements are irrelevant to its interpretation. *See, e.g., Providence Square Assocs., L.L.C. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000) ("If the terms of the contract are clear and unambiguous, then we must afford those terms their plain and ordinary meaning."). Moreover, as the district court observed, Miller's statements at the meeting are so confusing that they obviously do not clarify the meaning of the Plan, and they certainly do not make it clear that the Plan does not restrict protected speech. Not only was Miller's immediate response to Mansoor's question about rights as a private citizen confusing, but Miller later stated that there could be no confusion now "because it's in writing." Finally, Mansoor's asserted deposition "admission" that Miller clarified the meaning of the Plan is taken out of context; Mansoor stated only minutes later that he understood the Plan to mean "you need to keep quiet. . . . I took it to mean that the document coupled with what I have personal knowledge of, that they didn't want me to speak up about anything at all in the department."

Alternatively, Appellants maintain that they could have reasonably believed that the *Pickering* balancing test must be resolved in their favor, citing cases holding that a government employer has an interest in preventing disruption in the workplace. *See, e.g.*, *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 354-55 (4th Cir. 2000); *Berger v. Battaglia*, 779 F.2d 992, 1000-01 (4th Cir. 1985).

The problem with this contention is that, as the district court found, "the record fails to reflect any direct disruption caused by the plaintiff. Indeed, upon returning to work after his medical leave, the plaintiff received a letter of appreciation for his professional response to a local burglary . . . ." *Mansoor*, 189 F. Supp. 2d at 436. Of course, the law does not require government officials to wait until a disruption has occurred before taking action, but in this case under the evidence proffered by Mansoor, there is no reason to believe that his conduct was likely to cause a disruption even prospectively, since it had not caused a disruption in the past.[4]

---

[4]Appellants also contend, relying on *Lake James Cmty. Volunteer Fire Dep't., Inc. v. Burke County*, 149 F.3d 277 (4th Cir. 1998), that Mansoor waived his First Amendment rights. But, as the district court explained, *Lake James* has little relevance here. In *Lake James*, the plaintiff fire department had no rights at all prior to entering into the contract and in the contract agreed to a limited and narrowly tailored waiver. Here, Mansoor certainly had First Amendment rights before agreeing to the Plan, and the waiver was cast in the broadest possible terms. Moreover, and most importantly, in *Lake James*, we ultimately engaged in balancing "the condition that a person give up his constitutional rights . . . against the government's interest in promoting the efficiency of public services," and found the balance tipped heavily in the government's favor. *Id.* at 282 (citing *Board of County Comm'rs v. Umbehr*, 518 U.S. 668 (1996)). The holding of *Umbehr*, the Supreme Court case on which the *Lake James* court relied, is "that the *Pickering* balancing test, adjusted to weigh the government's interests as contractor rather than as employer, determines the extent" to which "independent contractors are protected" by the First Amendment. *Umbehr*, 518 U.S. at 673. In this case, the district court properly found that the evidence to date weighed heavily, not in the government's favor as in *Lake James*, but in the plaintiff's. Contrary to Appellants' suggestion, *Lake James* does not stand for the broad proposition that government employers can write into employment contracts waivers of constitutional rights, leaving potential employees with

Moreover, even if Appellants had a legitimate interest in restricting Mansoor's unprotected comments about his employment, this does not justify the Plan's restriction on Mansoor's prospective speech about matters of public concern as a private citizen. In fact, Appellants conceded at oral argument that they had "absolutely" no interest in restricting Mansoor's right to speak, as a citizen, on matters of public concern.

B.

Turning to the second prong of the qualified immunity analysis, there is little doubt, as the district court concluded, that the rights Mansoor claims were violated by the Plan were clearly established during the relevant time period. The Supreme Court articulated the principles governing this case in *Pickering*, decided in 1968, and *Connick*, decided in 1983. *See Connick*, 461 U.S. at 142; *Pickering*, 391 U.S. at 568. Thus, when Appellants drafted the Plan and presented it to Mansoor in 1998, the governing principles had been established for at least fifteen years.

Appellants' principal contrary argument is that in cases involving qualified immunity and the *Pickering* balancing test, the outcome of the balancing test can "only infrequently" be said to be "clearly established." *See DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995). Although this is so, "we did not say [in *DiMeglio*] that a public employee's right to speak on matters of public concern could *never* be clearly established." *Cromer*, 88 F.3d at 1326 (emphasis in original). In this case, as discussed earlier, Appellants have conceded that they had *no* interest in restricting the clearly protected speech covered

---

the choice of accepting the job under those conditions, or finding work elsewhere. Such an interpretation would fly in the face of *Pickering* and *NTEU*, which hold that government employers *cannot* place such conditions on employment unless the government's interests "in promoting the efficiency of the public services it performs through its employee" outweigh those of the employee "in commenting on matters of public concern." *See NTEU*, 513 U.S. at 465-66; *Pickering*, 391 U.S. at 568. Rather, *Lake James* simply constitutes an application of the *Pickering* balancing test in which the balance tips in favor of the government.

by the Plan (*i.e.*, Mansoor's right to speak about matters of public concern as a private citizen). Given this concession, we have no difficulty concluding that the district court did not err in denying them qualified immunity.[5]

### III.

For the foregoing reasons, the judgment of the district court denying Appellants qualified immunity is

*AFFIRMED*.

---

[5]Appellants also argue that "even if the plan were found to implicate Mansoor's First Amendment rights, Mansoor identifies no facts which support his claim against Trank or Rhoads." This is a sufficiency of the evidence claim over which we have no jurisdiction at this time. *See Winfield v. Bass*, 106 F.3d 525, 529-30 (4th Cir. 1997) (*en banc*) ("[T]o the extent that the appealing official seeks to argue the insufficiency of the evidence to raise a genuine issue of material fact . . . we do not possess jurisdiction under § 1291 to consider the claim and, therefore, may not do so absent some independent jurisdictional base.").