**William BURRELL, Jr., Plaintiff**

v.

**Stephanie ANDERSON, et al., Defendants**

**No. CIV.04–43–P–K.**

United States District Court, D. Maine.

Jan. 13, 2005.

William L Burrell, Jr, Etna, Pro se, for William L Burrell, Jr O/B/O Himself and as biological custodial parent O/B/O and as next friend of, A.B., Plaintiff.

William R. Fisher, Attorney General's Office, Augusta, ME, for Stephanie Anderson, Ann Berlind, Meg Elam, defendants.

Bruce M. Merrill, Portland, ME, for Scott Dunham, Joe Ezepeek, Tom Joyce, Nichael Chitwood, defendants.

Michael J. Schmidt, Wheeler & Arey, P.A., Waterville, ME, for Cumberland County, defendant.

### ORDER ON MOTION FOR SANCTIONS AND DECISION ON THREE MOTIONS FOR SUMMARY JUDGMENT [1]

KRAVCHUK, United States Magistrate Judge.

All of William Burrell's due process, equal protection, First Amendment, and

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magis-

civil rights conspiracy claims stem from incidents involving either Burrell and his former girlfriend, Colleen Morse or their daughter, A.B., and Morse's subsequent boyfriend, Mike Ryan Burrell contends that Portland Police Department and Cumberland County District Attorney's Office employees improperly responded or unacceptably failed to respond to these incidents. The overriding theme of Burrell's suit seems to be that gender-discriminatory attitudes and policies pertaining to domestic abuse were the driving force behind the defendants' flawed response to these various incidents.

Stephanie Anderson, Meg Elam, and Anne Berlind, all employed by the Cumberland County District Attorney's office and hereinafter referred to as the State defendants, have filed a motion for summary judgment. (Docket No. 58.) Tom Joyce, Scott Dunham, Joe Ezepek, and Michael Chitwood, all employed by the Portland Police Department and hereinafter referred to as the City defendants, have also filed a motion for summary judgment and have also moved for summary judgment on their defamation, libel, and slander counterclaims. (Docket No. 61.) And Cumberland County, the remaining defendant, sued by Burrell on a theory that it is responsible for the policy or custom of discriminatory enforcement of domestic violence laws, has submitted a third motion for summary judgment. (Docket No. 59.)

Burrell has responded to these motions. In addition he has filed a motion for sanctions (Docket No.72) complaining, one, about perceived discrepancies in the numbering of reports made by Dunham vis-à-vis one of the incidents and, two, about the failure of Joyce, Dunham, Elam and Ber-

lind to preserve voicemail messages left by Burrell that, Burrell adamantly contends, they should have known Burrell would need to prove that he was not being abusive in leaving the messages and that he was indeed complaining of matters of great public concern. In Burrell's view these two failings amount to spoliation of the evidence.

I now **DENY** Burrell's motion for sanctions, although, as requested by Burrell, I have considered his concerns about these two issues while wading through the evidentiary support for the parties' positions apropos the summary judgment motions. I also now **GRANT** the three motions for summary judgment as there is no genuine dispute of material fact that would justify denying judgment to these three sets of defendants on all of Burrell's claims. I do, however, view the City defendants' six-paragraph factual statement and one-paragraph argument that they are entitled to summary judgment on their counterclaims as inadequate and **DENY** them judgment on their counterclaims. I also decline to exercise supplemental jurisdiction over these state-law claims. Accordingly they are **DISMISSED**.

## DISCUSSION

### I. Motions for Summary Judgment

#### A. Summary Judgment Standard

The defendants are entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and that the defendants are "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A

trate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and

to order entry of judgment.

fact is material if its resolution would "affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.* I review the record in the light most favorable to Burrell and I indulge all *reasonable* inferences in his favor. *See Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir.2000) (emphasis added).

The fact that Burrell is a *pro se* plaintiff does not free him from the pleading burden set forth in Rule 56. *See Parkinson v. Goord,* 116 F.Supp.2d 390, 393 (W.D.N.Y. 2000) ("[P]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."); *see also Sirois v. Prison Health Servs.,* 233 F.Supp.2d 52, 53–55 (D.Me.2002). While Burrell's complaint may be held to a less stringent pleading standard under *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), his *pro se* status does not shield him from Rule 56's operative provision under subsection(e) requiring the pleader to "set forth such facts as would be admissible in evidence."

To the extent that Burrell attempts to qualify the statements by referring to the same record citations as the defendants or by generally referencing an entire exhibit of his own *without explication whatsoever of what is the nature of his qualification,* I have disregarded his response. Also, District of Maine Local Rule 56 contemplates the court will discount any statement of material fact or a response containing irrelevant argument or factual assertions unsupported by appropriate record citation. *See* Dist. Me. Loc. R. 56(e); *Toomey v. Unum Life Ins. Co. of Am.,* 324 F.Supp.2d 220, 222 (D.Me.2004). "[E]vidence illustrating the factual controversy cannot be conjectural or problematic," *see Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989); *accord Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir. 1997), and "effusive rhetoric and optimistic surmise" is not enough to establish a genuine issue of material fact, *see Cadle Co.,* 116 F.3d at 960. In accordance with these principles, I have disregarded unsupported or argumentative portions of Burrell's responses to the defendants' statement of fact and Burrell's statement of additional facts.

## B. Three Takes on the Facts [2]

### 1. City Defendants' Statement of Material Fact

William Burrell, Jr. alleges that he is a "class of one" in the male gender.[3] A.B. is

---

**2.** To put it mildly, it is a cumbersome undertaking to set forth three different variations on the material facts. However, there is no obvious better alternative, as each set of defendants must demonstrate their entitlement to judgment on the record (and must defend any disposition in their favor should Burrell appeal). Burrell's additional facts are the same for each set of defendants and, thus, propounding three separate opinions would prove even more redundant. That said, I do not at this juncture include the County's own version of material facts as it proves to be

unnecessary, as explained below. The three sets of facts put forth are the City's, the State's and Burrell's. To the extent possible I have tried to avoid repetition where the facts alleged are essentially redundant.

**3.** Burrell claims to be qualifying this statement, citing only to paragraph 24 of his amended complaint which states in its entirety: "Plaintiff, William L. Burrell Jr. asserts he is a 'class of one' in the male gender."

the seven-year-old biological minor daughter of Burrell and Colleen Morse.[4] Michael Chitwood is the Chief of Police of the Portland Police Department. Thomas Joyce is a detective sergeant with the Portland Police Department. Scott Dunham and Joseph Ezepek are detectives with the Portland Police Department.

### a) The 1996 incident with Burrell and Colleen Morse

On October 20, 1996, Burrell was charged with "Aggravated Assault" (*see* Pl.'s Ex. 4–A(22)) against Morse by members of the Scarborough Police Department. Two Scarborough Police officers, responding to a report of a "fight," arrived at Burrell's apartment on October 20, 1996, and observed a large bruised and swollen area around Morse's left eye. One officer described Morse to be "scared and shaking" although quiet and timid when the officers arrived. Morse later indicated that she was calm until the officers came between them.

Morse told that same officer that Burrell had struck her several times in the head, spit in her face, punched her in her left ear, kicked her hard in the vagina, and punched her "so hard she felt her ribs break." Burrell denies this statement but does not deny that Morse told the officer this information. Rather, Burrell states that Morse later recanted her story and explained to Burrell and the District Attorney Anne Berlind that she had lied.

Morse was transported to Mercy Hospital by ambulance. She was treated for "multiple facial contusions, contusions to chest wall with probable fractured ribs, as well as multiple contusions to extremities." X-rays of her left shoulder, cervical spine, and chest came back normal. Burrell was transported to the Cumberland County Jail.

According to Officer Moore, although Morse had told him what Burrell had done to her, she refused to sign anything because she felt her cooperation would make him kill her. Burrell responds by pointing to written interlineations on Moore's report made by Morse. Vis-à-vis Moore's characterization of what Morse told Moore, Moore wrote:

> I think that this statement *has to be* the *most Hideous* of it all. I am not physically afraid of him + I *have never* + *will never* be afraid of him killing me! How can something be this completely blown out of proportion?
>
> The officer did bring up the murder-suicide that happened down the road last year. This has got to be where he got the idea to put that in here. Sorry for being or sounding presumptuous, but I never said anything even close to being afraid for my life.
>
> If this wasn't a serious allegation, it would be utterly laughable.

There is no evidence that any of the defendants ever saw this report after Morse wrote on it and color-coded it. It is my understanding that Burrell expects Morse to testify along these lines.

The Scarborough Police referred the matter to the Cumberland County District Attorney's Office. Assistant District Attorney Berlind primarily handled the case.

---

4. In treating the three pending motions for summary judgment and Burrell's responsive pleadings I have attempted to give Burrell the benefit of the doubt with respect to his record citations. Burrell has a penchant for stating that he is denying or qualifying a statement and then citing to an exhibit without any explanation of how the cited exhibit is meant to support the denial or qualification. There are several times that I entirely disregard the purported qualification or denial because there is no way of identifying how or in what way the evidence counters or modifies a given statement of material fact.

Burrell offers the qualification that Assistant District Attorney Meg Elam also handled aspects of the case.

After the matter was referred to the District Attorney's Office, Morse wrote a number of letters to Berlind asking her to dismiss the case against Burrell. Berlind ultimately dismissed the assault charge against Burrell after concluding that she could not meet the burden of proving that Burrell assaulted Morse "beyond a reasonable doubt." Burrell believes that Berlind did the "right thing" by dismissing the assault charge against him.[5]

### b) The 1998 Audiotape

In November of 1998, Burrell brought audiotapes to the Cumberland County District Attorney's Office that he had made of conversations between himself and Colleen Morse and requested a meeting with Berlind. Burrell believed that the tapes contained evidence of criminal wrongdoing by Morse against him. Burrell also believed that the tapes were evidence of violence or some sort of criminal restraint by Morse in 1998.

According to the City defendants, as there was no criminal charge pending, Berlind declined to listen to the tapes and summonsed Burrell to retrieve them. Berlind further advised Burrell that she was a prosecutor, not an investigator, and that he should take the tapes to the Police Department.[6]

According to the City defendants, Burrell never brought the audiotapes of his conversations with Morse to the Portland Police Department in 1998; he did so in November 2003. Neither did he ever fill out a complaint or file a police report against Morse with any law enforcement agency. Burrell responds with cites to two lengthy letters he sent to Detective Dunham in November of 2003 detailing Mike Ryan's mistreatment of A.B. (the brunt of both letters) and Morse's history of deception and manipulation apropos domestic violence complaints. In one of these letters he indicates that Morse should be charged with endangering the welfare of a child.

### c) Ryan's 2003 Alleged Assault against A.B.

On November 10, 2003, Portland Police Officers John Morin and Robin Gauvin commenced an investigation into an alleged assault by Michael Ryan against A.B., Burrell's seven-year-old daughter. Ryan was Morse's live-in boyfriend. Morin and Gauvin took statements from A.B., Morse, Heidi Smith (A.B.'s babysitter), Ryan, and Burrell. Burrell responds that Gauvin may have been overseeing and verifying reports but that Burrell had contact only with Morin.

The City defendants describe the information garnered as follows. Burrell did not see Ryan assault A.B. Burrell was not physically present at the time.[7] The statement of the babysitter, Heidi Smith, indi-

5. Burrell qualifies this statement of fact by indicating that Morse also confessed in these letters that she initiated the assault against Burrell after Burrell commented on her C–Section scar.

6. Burrell qualifies this statement on the grounds that Berlind had a different motivation for not listening to the tapes. He points out that Berlind agreed to meet with Morse in 1998 with respect to Morse's 1998 protection

from abuse proceedings against Burrell. Burrell believed he was similarly situated with Morse at the time.

7. Burrell qualifies the statements in this paragraph by reference to Exhibit 16 of his deposition transcript. However, this document is not in the summary judgment record as far as I can discern.

cates that she saw bruises on A.B.'s upper arms when giving her a bath "a couple of weeks" prior to November 10, 2003. According to Smith, A.B. looked "surprised" when Smith pointed out the bruises on her arms, and A.B. told Smith that "they probably came from playing around." A.B. told Officer Morin that Ryan caused the bruises when he "grabbed" her left arm and "dragged" A.B. to her room.

Burrell views this as a sanitized description of what A.B. told the officers and he cites to Exhibit 6–D, a Portland Police Witness Statement penned by a detective and signed by A.B. It reads:

> I go with my mom on the weekends. Usually I stay with her for 3 days. Michael Ryan is my mom's boyfriend. He lives with my mom.
>
> I was staying at my mom's house. I think it was 2 weeks ago. Mike grabbed my left arm and dragged me to my room. He put a bruise on my arm.
>
> Sometimes my mom and Mike fight. They push each other. Sometimes he grabs my body to put me in my room and that hurts.
>
> Probably a week ago I was staying at my mom's house again. Mike told me not to talk. I asked something and he made me go to my room. I wanted to give my mom a hug. I tried to go to the living room to give my mom a hug. Mike tried to push me. He tried to get me in my room. I accidentally scratched his arm. I didn't even notice. He told me. He pushed me. I fell and hit my arm on the corner of the wall. I went to my bed and cried. It hurt. My mom came in and she said I scratched Mike's arm. I told her I didn't know. She tried to calm me down. Then my mom told me I could go to the living room and watch the movie. I went and told Mike I was sorry that I scratched him.

> The next day that I was with my mom Mike said he was sorry. He said, "I'm sorry for the bruises." He said, "[T]hanks for not mentioning it to your father." I had a big bruise on my arm from hitting the wall." I told my dad last night and today what happened.

Burrell decided to "introduce himself" to Dunham by writing him a letter dated November 16, 2003. Included with that letter were three audiotapes, including the 1998 "felony kidnapping" tape. Burrell cited to some of the text of the lengthy letter he sent to Dunham dated November 16, 2003, detailing Mike Ryan's mistreatment of A.B. (the brunt of both letters) and Morse's history of deception and manipulation apropos domestic violence complaints.

On or about November 24, 2003, Burrell telephoned Dunham to ask if he had reviewed the letter and tapes that he had sent him. Dunham advised Burrell that any evidence regarding the possibility of felony kidnapping on the part of Morse would be better handled by Detective Ezepek. Burrell called Ezepek, who agreed to review the tapes for Burrell, one of which had the kidnapping incident on it.

On December 3, 2003, Dunham interviewed Morse about the alleged assault against A.B. Morse told Dunham that she had seen a bruise on A.B.'s arm and that A.B. told her that she got hurt at school. Morse also described an incident that occurred between A.B. and Ryan when A.B. was having a tantrum and was told to go to her room. According to Morse, Ryan was standing in the doorway of A.B.'s room when, A.B. came to the doorway in an attempt to get past, Ryan did not move his arm, and A.B. scratched his arm. Morse said that she did not believe the scratch was intentional. Morse told Dunham that the scratch caused Ryan to move his arm, which, in turn, caused A.B. to fall back

onto the floor. However, Morse said this fall did not cause a bruise. Morse claimed to have seen a bruise on A.B.'s arm prior to this incident.

Dunham interviewed Ryan separately from Colleen Morse on December 3, 2003. Ryan's version of what happened when A.B. scratched his arm essentially corroborated what Colleen Morse had told Dunham.[8]

In November of 2003, Dunham interviewed A.B. A.B. told Dunham that Ryan had pushed her, that the push caused her to fall into a corner of the wall in her room, and that she might have accidentally scratched Ryan before that happened. A.B. told Dunham that Ryan never spanked her but that he had "pulled her once" and left a bruise on her arm. A.B. also told Dunham that Ryan sometimes squeezed her arms when he lifted her up but that no one else had seen him do it.

The Cumberland County District Attorney's Office was given the Portland Police Department's investigative report into Ryan's alleged assault against A.B. The assault case against Ryan was "no-complainted" on December 10, 2003, because the incident was not reported for more than a month; because A.B. gave inconsistent statements to both her babysitter and the investigating police officers about how she sustained bruises; because the alleged assault consisted solely of "grabbing"; because there may have been a viable "parental discipline" defense; because Mr. Burrell appeared to have been motivated to pursue Ryan's prosecution by a vendetta against Morse; and there

was no reasonable likelihood of successful prosecution. The reviewing assistant district attorney was Berlind.[9]

Burrell responds to this version of the reason for not pursuing Ryan by pointing out that the district attorneys have waited for as long as seven months to charge assault; that A.B. had given only one inconsistent statement; that her descriptions of Ryan's physical contact with her was detailed and extensive; and that Morse indicated that during the investigation she spoke with Dunham and was not asked whether or not Ryan was expressly given authority to physically discipline her daughter and that, to the best of her knowledge, the subject of a parental defense never came between Morse and Dunham or the district attorneys. Burrell expounds:

This case was no-complainted as a result of an epidemic of gender biased investigation and arrest criteria because of the pervasive distaste for men who have been involved in a domestic violence dispute making them public enemy number one pursuant to the PPD and the CCDA's unconstitutional gender stereotypical beliefs evidenced by their domestic violence policies and their public displays of verbal gender classifications.

In support of this argument, Burrell cites to Dunham's supplemental December 9, 2003, report (Pl.'s Ex. 26–B), the Portland Police Department incident report (Pl.'s Ex. 6–C), A.B.'s Witness Statement (Pl.'s Ex. 6–d), three print-outs from the Cumberland County District Attorney's Office Web-site viewed when navigating to and

---

8. Burrell attempts to deny this statement of fact by arguing how this physical interchange between Ryan and A.B. should have been viewed by Dunham, Moore, and Anderson. Burrell contends that the offensive physical contact was rendered by Ryan not A.B., and

he faults Dunham and Morse for implying that the fault lies with A.B.

9. Paragraphs 36 and 40 of the City defendants' statement of material fact and Burrell's response thereto are substantially similar so I have combined them to avoid redundancy.

setting forth the page devoted to domestic violence, and the affidavit of Richard Davis (Docket No. 82).

In his affidavit, Davis represents that he is an independent contractor with the United States Investigation Services. and an adjunct instructor in the field of collective violence and terrorism, domestic violence, criminology and criminal justice. Davis has reviewed the domestic violence statement in Burrell's Exhibit 6–C and other of his exhibits including witness statements and police reports. In his opinion the incident between A.B. and Ryan should not have been characterized as "grab-only"; that the Scarborough Police Department, the .Portland Police Department, and Cumberland County are following what is called the "primary or dominant aggressor" guidelines that follow the Duluth Model; that the Scarborough Police Department should have spoken longer than one minute with Burrell and Morse before arresting Burrell in 1996; that Dunham, Ezepek, and Berlind should have "at least made reasonable inquiry into the evidence provided by Mr. Burrell for this case"; his belief that it was more likely than not that certain of these defendants communicated with each other their belief that Burrell "is a typical male abuser of women"; his belief that the Portland Police Department website material "clearly shows the department discriminates against men because the only resources for men are batterer resources"; his belief that the Cumberland County District Attorneys' domestic violence policy is clearly discriminatory against men and has no place amongst criminal justice policies; and his belief, based on reviewing the records apropos the 1996 Morse/Burrell incident, that "Burrell is criminally INNOCENT of assaulting Ms. Morse in the past and that Ms. Morse is clearly guilty of filing false reports against Mr. Burrell."

Burrell also references Exhibit 51, which are answers to his interrogatories. The referenced interrogatory queries:

At our second discovery conference, your counsel stood up and state (paraphrase) that 90% of the time the man is the abuser in domestic violence situations and only around 10% of the time the woman is the abuser. His conclusions for this were based on, as he said, "I am a 50 year old man with a marital arts background." On June 15, 2004, on WCSH ch. 6 Police chief Michael Chitwood stated, "One in four women are abused by a man, one in fourteen men are abused by wom[e]n".

Admit whether you agree with the above statistic. If not, state what you believe are the correct statistics.

ANSWER: According to information presented at national conferences on domestic violence, as well as the domestic violence literature Anne Berlind has seen, men perpetrate ninety-five-percent (95%) of domestic violence, Women perpetrate five-percent (5%) of domestic violence. Anecdotally, Anne Berlind's experience with the Cumberland County District Attorney's Office suggests that the incidence of domestic violence committed by women is in the five to ten-percent (5–10%) range if domestic violence between women in same sex relationships is considered.

Burrell also references Exhibit 11, which is a pamphlet from the Cumberland County District Attorney's Office, entitled: "A Guide to the Criminal Justice System for Victims and Witnesses." The paragraph that pertains to the Domestic Violence team states that the team:

handles misdemeanor and felony domestic violence cases. Domestic violence has been called "public enemy number one." These cases are very sensitive

because the perpetrators are often the spouse, former spouse, or significant other of the victim. We established the Domestic Violence Unit in order to give these cases more attention by attorneys and victim assistants who are specially trained and dedicated to handle these cases. The average caseload per attorney is 500–600 cases per year.

The City defendants assert that at some point after December 3, 2003, Burrell attempted to contact Dunham for a status update on the investigation. Unable to speak with Dunham, Burrell asked for a supervisor in the Detective Division and was connected to Detective Sergeant Tom Joyce's voicemail, where Burrell left a message. After a couple of days, Burrell tried again to reach Dunham and got his voicemail. When Joyce came on the line, he advised Burrell that the District Attorney had ruled that morning that there was insufficient evidence to prosecute A.B.'s case.

At some point, Burrell spoke with Ezepek, who advised him that he "didn't hear any kidnapping, just talking" on the tapes. Ezepek further advised that Berlind had told Ezepek that it had been too long since the alleged incident took place.[10]

Berlind left a message on Burrell's answering machine explaining why the assault charges against Ryan were not being taken to trial. As with the case against Burrell, which alleged an assault on Morse, Berlind concluded that the State could not carry its burden of proving Ryan's guilt beyond a reasonable doubt. That, according to the City defendants, is the only reason the case against Ryan was not taken to trial.

Burrell retorts that Berlind "falsified the evidence and fabricated phony reasons why she wouldn't reach a determination of probable cause." He cites to Anderson's decision to override Berlind and allow for A.B. to be reinterviewed. Burrell also reiterates his contentions concerning gender discrimination contained in his responses to the defendants' explanation of the reasons for no-complainting Ryan's case.

Unhappy with Berlind's decision not to prosecute Ryan, the City defendants continue, Burrell called District Attorney Stephanie Anderson and asked her "to review the situation." Burrell did not believe that the evidence supported Berlind's reasons for not pursuing the case against Ryan. To which Burrell retorts that his beef with Berlind was that, whether in her role as an investigator or advocate, she falsified evidence in order to avoid finding probable cause sufficient to prosecute.

Anderson told Burrell that she would have Deputy District Attorney Meg Elam review the assault charges against Ryan and would make arrangements to have A.B. re-interviewed. Burrell and A.B. were scheduled to meet with Sergeant Steve Reese of the Portland Police Department on February 11, 2004, for a re-interview. Following a telephone conversation with Anderson on February 4, 2004, Burrell canceled the February 11, 2004, meeting that he had set up with Reese to re-interview his daughter, A.B.

Burrell, does not have a law degree, is not a licensed attorney, and is not trained as a law enforcement officer.

### d) City Defendants/Counterclaimant's Amended Counterclaims

Burrell admits to intentionally accusing Dunham and Ezepek of "being apathetic,

---

10. Burrell qualifies this assertion by citing the defendants' answers which state that Burrell knew that the statute of limitations had run a

year before Burrell brought the allegations of kidnapping to the defendants' attention.

evasive and distant." (Defs.' Ex. 3 ¶ 10.)[11] Burrell admits to intentionally accusing Joyce, Dunham, and Ezepek of "conspiring" to have Stephanie Anderson intimidate and threaten Burrell into not pursuing discrimination and falsification of evidence charges. (*Id.* ¶ 11.)[12] Burrell admits to intentionally accusing Joyce, Dunham, and Ezepek of "furtive" conduct. (*Id.* ¶ 12.)[13] Burrell admits that Dunham may have spent years developing a rapport within the Portland community. (*Id.* ¶ 13.)[14] Burrell admits that Dunham may have earned a reputation in the Portland community for honesty, integrity and fairness in dealing with the public.[15] Burrell admits that by filing what he believes are truthful allegations in his amended complaint he may have, in fact, caused damage to the character and reputations of Joyce, Dunham, and Ezepek.[16]

These defendants also attempt to establish their entitlement to judgment on the basis of Burrell's answers to their interrogatories. (*See* Pl.'s Resp. SMF ¶¶ 51–58.) However, in view of Burrell's response to paragraphs 52, 54, 56, and 58, the defendants are not entitled to judgment on this ground.

**2. State Defendants' Statement of Material Fact**

Stephanie Anderson, Meg Elam, and Anne Berlind, are employed by the Cumberland County District Attorney's Office as District Attorney, Deputy District Attorney and Assistant District Attorney, respectively. Their separate statement of material facts repeats many of the facts set forth by the City defendants and I will not repeat them here, only adding those additional facts that appear to relate primarily to the State defendants.

**a) The 1996 incident between Burrell and Morse**

The State defendants add the material detail that the original investigation involving Burrell and Morse was initiated by the Scarborough police when they received a call from third parties. On October 20, 1996, Pete and Noralee Raymond called the Scarborough Police Department to report "a fight" between Burrell and Morse. When the police went to Burrell's apartment, they observed a large swollen area around Morse's left eye. According to the defendants, Morse was "scared and shaking" when observed by one of the officers. According to Burrell, Morse was calm,

---

11. Burrell qualifies this assertion by citing pages one through eleven of his answers to these defendants' interrogatories and the entire transcript of his deposition. I cannot possibly divine the manner of Burrell's supposed qualification without any indication on Burrell's part as to the nature of his qualification.

12. Burrell qualifies this paragraph by citing, without any elaboration, twenty-three paragraphs in his amended complaint. I am not able to distill an appropriate qualification on review of those allegations.

13. Once again, Burrell qualifies this assertion by citing pages one through eleven of his answers to these defendants' interrogatories and the entire transcript of his deposition.

And, again, I cannot possibly divine the manner of Burrell's supposed qualification without any indication on Burrell part as to the nature of his qualification.

14. Here Burrell qualifies this assertion solely by regurgitating the defendants' citation to paragraph 13 of his answer to the City defendants' counterclaims.

15. Yet again Burrell qualifies this assertion solely by regurgitating the defendants' citation to, this time, paragraph 14 of his answer to the City defendants' counterclaims.

16. True to form, Burrell qualifies this assertion solely by regurgitating the defendants' citation to, this time, paragraph 16 of his answer to the City defendants' counterclaims.

very quiet, and timid, until the responding officer got between Morse and Burrell.

Burrell claims that Morse attempted "a nose dive off the banister," that he attempted to prevent her from doing so, and that she "made it over the banister and fell down the stairs hitting what seemed like everything." Morse told Officer Robert Moore of the Scarborough Police Department that Burrell struck her in the head several times, spit in her face, punched her in the left eye, kicked her in the vagina, and punched her "so hard she felt her ribs break." Burrell denies this statement but does not deny that Morse told the officer this information. Rather, Burrell states that Morse later recanted her story and explained to Burrell and Berlind that she had lied.

Morse, the State defendants assert, would not sign anything because she felt her cooperation would make Burrell kill her. Morse was taken to the Mercy Hospital by ambulance. She was treated for "multiple facial contusions, contusion to chest wall with probable fractured ribs as well as multiple contusions to extremities." Burrell qualifies this statement by stating that the x-ray taken all came back normal.

The criminal charges against him were referred to the Cumberland County District Attorney's Office, where both Meg Elam and Anne Berlind handled aspects of the assault charge. After the charges against Burrell were referred to the DA's Office, Morse wrote Berlind a number of letters asking her to dismiss those charges. Ultimately, Berlind dismissed the assault after she concluded she could not meet her burden of "proving that [Burrell] assaulted [Morse] beyond a reasonable doubt." Burrell believes that Berlind did "the right thing" when she dismissed the assault complaint against him.

### b) Burrell's 1998 Audiotapes

The State defendants provide some additional details surrounding the 1998 audiotapes brought to the Cumberland County District Attorney's Office. Burrell asked for a meeting with Berlind. The audiotapes Burrell brought to the DA's Office were recordings of conversations he had with Colleen Morse. Burrell believes that the tapes he brought to the DA's Office contained evidence that Morse had committed numerous assaults against him and harassed him by telephone. Burrell qualifies, indicating that the tapes included thirty-seven phone messages to him left by Morse during the night and also his audiotaped message to Berlind pleading and begging for help. (Pl.'s Exs. 1–A–1–D.)

Burrell also believes that the audiotapes he brought contained evidence that Morse kidnapped him in 1998, what he later described as "felony kidnapping." Burrell wanted Berlind to listen to the audiotapes he left at her office. In his estimation, it would have taken Berlind approximately one and one-half hours to listen to the tapes.[17]

Sometime after Burrell left the audiotapes at the District Attorney's Office, Berlind called him and left a message on his answering machine. This message stated, in part, that "there's no criminal case so I'm not gonna be listening to the

---

**17.** Burrell qualifies this description, stating (without record citation to anything but the tapes) that he does not recall demanding that Berlind listen to each tape in its entirety and that listening to ten or fifteen minutes of the tapes would have been sufficient to "raise significant red flags in the mind of any reasonable non-bias[ed] prosecutor as to the credibility and truthfulness of Colleen Morse, not to mention it would have put them on notice of her crimes." He also indicates that he wanted Berlind to meet with him, as she did offer to meet with Morse.

tapes you dropped off, and I'd ask that you come pick them up again." After listening to Berlind's message, Burrell called her back and left a voicemail message which stated, in part,

> if somebody makes you aware of a crime, or you have knowledge of a crime, you have a duty to investigate it and report it. It's not fair that you're willing to meet with Colleen [Morse] and not me, especially when you know I have evidence of her serious crimes and proof that she's about to lie to you concerning me assaulting her, right on tapes you have in your possession, and you're telling me your not gonna listen to them. It seems to me discriminatory.

Sometime after Burrell left this message Berlind left another message on his answering machine which stated, in part as follows:

> I listened to your message. You are mistaken about what my role is. I'm a prosecutor. I'm not an investigator. Investigation is the role of the police department. So if you want them to investigate any potential crimes, you should take the tapes to the police department and let them review them, and they make the initial determination as to whether there's a potential crime that ought to be referred to my office for review.

In 1998, Burrell did not bring the audiotapes of his conversations with Morse to the Portland Police Department. He waited until 2003. He never filled out a complaint form accusing Morse of committing a crime against him.

> Burrell refers to his allegation that he, felt so disgusted, hurt and powerless after hearing Berlind's final message in 1998, he believed *even if he did take the tapes to the police department,* that Berlind would ignore the evidence because her disdain was so clear and **she had already ignored exculpatory evidence exonerating Burrell back in 1996,** *so had every reason to believe she would ignore or bury culpable evidence against Morse **again** even if it was presented to her in what she claimed was her "role as a prosecutor", because he thought at the time, she would have as she did before, the prosecutorial discretionary legal right to ignore it.*

(Am.Compl.¶ 76.) He states that he did not fill out a complaint against Morse because he was "identically similarly situated to Morse." He also asserts that he did not wait until 2003 to bring the tapes to the Portland Police Department; the delay was because Berlind tricked and affirmatively mislead Burrell, discouraging him with her blatant disdain for the evidence.

In a conclusory fashion, the defendants state that Stephanie Anderson, Meg Elam and Anne Berlind did not manufacture, withhold, falsify, conceal, or destroy any evidence concerning William Burrell's 1996 assault against Colleen Morse. (State Defs.' Ans. Pl.'s Int. 27.) Burrell retorts that Elam and Berlind withheld and concealed evidence from the court of Morse's confessions that she assaulted Burrell. (Pl.'s Exs. 4–A(1)–A(4).) He contends that they did this based on gender classifications and stereotypes that the abuser is most often the male. As evidence Burrell points to the use of the pronoun "he" in reference to the traits of an abuser on the domestic violence web page of the Cumberland County District Attorney's Office containing text written by Anderson with the assistance of Berlind. (State Defs.' Ans. Pl's Int. 26.)

#### c) Ryan's 2003 Assault Against A.B.

According to the State defendants, the Cumberland County District Attorney's Office was given the Portland Police De-

partment's investigative report into Ryan's alleged assault against A.B. The assault case against Ryan was "no-complainted" according to the State defendants because the incident was not reported for more than a month; because A.B. gave inconsistent statements to both her babysitter and the investigating police officers about how she sustained bruises; because the alleged assault consisted solely of "grabbing," because there may have been a viable "parental discipline" defense; and because Burrell appeared to have been motivated to pursue Ryan's prosecution by a vendetta against Morse.

Burrell responds to this explanation for not pursuing Ryan by pointing out that the district attorneys have waited for as long as seven months to charge assault; that A.B. had given only one inconsistent statement; that A.B.'s descriptions of Ryan's physical contact with her was detailed and extensive; and that Morse indicated that during the investigation she spoke with Dunham and was not asked whether or not Ryan was expressly given authority to physically discipline her daughter and that, to the best of her knowledge, the subject of a parental defense never came between Morse and Dunham or the district attorneys.

Burrell expounds:

This case was no-complainted as a result of an epidemic of gender biased investigation and arrest criteria because of the pervasive distaste for men who have been involved in a domestic violence dispute making them public enemy number one pursuant to the PPD and the CCDA's unconstitutional gender stereotypical beliefs evidenced by their domestic violence policies and their public displays of verbal fender classifications.

In support of this argument, Burrell cites to Dunham's supplemental December 9, 2003, report (Pl.'s Ex. 26–B), the Portland Police Department incident report (Pl.'s Ex. 6–C), A.B.'s Witness Statement (Pl.'s Ex. 6–d), three print-outs from the Cumberland County District Attorney's Office Web-site reaching and setting forth the page devoted to domestic violence, and the affidavit of Richard Davis (Docket No. 82). Davis is an independent contractor with the United States Investigation Services and an adjunct instructor in the field of collective violence and terrorism, domestic violence, criminology and criminal justice. Davis has reviewed the domestic violence statement in Burrell's Exhibit 6–C and other of his exhibits including witness statements and police reports. In his opinion the incident between A.B. and Ryan should not have been characterized as "grab-only"; that the Scarborough Police Department, the Portland Police Department, and Cumberland County are following what is called the "primary or dominant aggressor" guidelines that follow the Duluth Model; that the Scarborough Police Department should have spoken longer than one minute with Burrell and Morse before arresting Burrell in 1996; that Dunham, Ezepek, and Berlind should have "at least made reasonable inquiry into the evidence provided by Mr. Burrell for this case"; his belief that it was more likely than not that certain of these defendants communicated with each other their belief that Burrell "is a typical male abuser of women"; his belief that the Portland Police Department website material "clearly shows the department discriminates against men because the only resources for men are batterer resources"; his belief that the Cumberland County District Attorneys' domestic violence policy is clearly discriminatory against men and has no place amongst criminal justice policies; and his belief, based on reviewing the records apropos the 1996 Morse/Burrell incident that "Burrell is

criminally INNOCENT of assaulting Ms. Morse in the past and that Ms. Morse is clearly guilty of filing false reports against Mr. Burrell."

Berlind left a message on Burrell's answering machine explaining why the assault charges against Ryan were not being taken to trial. As with the case against Burrell alleging an assault against Morse, Berlind concluded that the State could not carry its burden of proving Ryan's guilt beyond a reasonable doubt. That, Berlind asserts, is the only reason the case against Ryan was not taken to trial. If in the exercise of her prosecutorial discretion Berlind believed that she could have proved Ryan's guilt beyond a reasonable doubt, the case against him would have proceeded to trial.

Burrell retorts that Berlind "falsified the evidence and fabricated phony reasons why she wouldn't reach a determination of probable cause." He cites to Anderson's decision to override Berlind and allow for A.B. to be reinterviewed. He reiterates his contentions concerning gender discrimination contained in his responses to the City defendants' assertions of the reasons for no-complainting Ryan's case. He claims that Berlind and Anderson implied that the only information A.B. provided the police was that she was only "grabbed" which is different than saying that in their professional opinion A.B. was only grabbed. This "contradiction" Burrell views as evidence of falsification. He charges Berlind with misinterpreting the facts and pretextually mischaracterizing the case as non-triable. Burrell also references his Exhibit 51, which are answers to his interrogatories and to the public policy statement on domestic violence under the District Attorney's office. *See* App. G. (2) & (3). Based on these two record references Burrell asserts that Berlind did not want to see Burrell pursue any action that would adversely affect Morse vis-à-vis whom Berlind had "a history of gender biased sympathy for and leniency toward." According to Burrell, Berlind knew that Morse was an admitted liar and yet she wished Morse her best in the letter explaining that Berlind was dismissing the assault case against Burrell and still wanted to meet with Morse two years after the 1996 incident.[18] He also faults Berlind for having the nerve to say that A.B. gave inconsistent statements vis-à-vis the Ryan incidents.

Unhappy with Berlind's decision not to prosecute Ryan, Burrell called Anderson and asked her "to review the situation." Burrell did not believe that the evidence supported Berlind's reasons for not pursuing the case against Ryan. Burrell adds that his discontent with Berlind was that, whether in her role as a investigator or advocate, she falsified evidence in order to avoid finding probable cause sufficient to prosecute.

Anderson told Burrell that she would have Meg Elam review the assault charges against Ryan and made arrangements to have A.B. re-interviewed. Burrell and A.B. were scheduled to meet with Sergeant Steve Reese of the Portland Police Department on February 11, 2004 for a re-interview.

#### d) Burrell's February 4, 2004, telephone call with Anderson

Burrell spoke with Anderson on February 4, 2004, about A.B.'s re-interview. During their conversation, Anderson asked

---

**18.** Burrell attempts to assert that Berlind tried to bail Morse and Ryan out in 1998 and 2003 because she believed that Burrell had a vendetta against Morse. The record support for this assertion does nothing but provide the defendants' definition of vendetta. (*See* Pl.'s Ex. 51 at 2.)

Burrell to "stop calling this Office in the middle of the night and leaving long winded voice mail messages." Burrell's voicemail messages included his interpretation of what he believed to be relevant case law and repeated what he had already told the police officers investigating the alleged assault by Ryan against A.B. According to the State defendants, Burrell's voicemail messages did not provide the District Attorney's Office with useful evidence concerning the alleged assault against A.B. by Ryan.

Burrell responds, relying on references to his complaint allegations and the Cumberland County District Attorney's Office domestic violence web page, that the defendants destroyed his voicemails because they contained complaints of matters of great public concern and this falsification of evidence was pursuant to an unconstitutional gender-biased domestic violence policy that is discriminatory towards men who are involved in domestic violence disputes. In the voicemail messages Burrell claims he stated: "Please don't think of me as a trouble maker" and, "the last thing I want to do is burden the court or the resources of the D.A.'S office with litigation but can somebody please get back to me[?]" In Burrell's view this put the defendants on notice that there was potential litigation on the horizon and alerted them to the need to preserve the voicemails. He also states that in one message to Elam he read a January 23, 2004, statement by Morse which indicated that Ryan and she were aware that they had violated a parental rights order when Ryan disciplined A.B., promising that they would desist from further discipline.

Burrell alleges that Anderson intimidated him during the February 4, 2004, telephone conversation and "chilled" the exercise of his First Amendment rights. After Burrell spoke with Anderson on February 4, 2004, he cancelled the February 11, 2004, interview Anderson had arranged for A.B with Sergeant Reese. By a letter dated February 9, 2004, Burrell told Reese that A.B. would not be meeting with him because he felt it necessary to seek advice from legal counsel.

Burrell states that Anderson was careful to expressly order Burrell not to seek redress for his grievance, as she was an experienced law enforcement agent with twelve-years experience cross-examining people. The totality of the conversation with Anderson left Burrell with an understanding that he was "being scolded for prior speech and that he had to keep quiet in the future about the falsification of evidence and discrimination and [his] daughter would be reinterviewed [under] unconstitutional conditions." He also states that seeking legal counsel was not the only reason for not having A.B. re-interviewed, asserting that his decision was based on the totality of the circumstances, circumstances that also included Burrell's belief that he had no friends left in the system, everyone felt that he was abusive, the police did not want to interview A.B., and the police had already falsified and suppressed evidence and discriminated against Burrell and A.B.

### e) Conspiracy

Anderson, Elam, and Berlind, assert that they did not conspire with anyone to deprive Burrell or A.B. of their federally protected rights. In rebutting these statements Burrell cites to the "meeting of the minds" apropos Anderson and Elam agreeing that Elam would not forward Burrell voicemails to Anderson even though they contained complaints of great public concern. Burrell claims that these defendants and the city defendants gave evasive answers regarding what was said between and betwixt them regarding the investiga-

tion of Burrell, demonstrating sudden memory losses. He complains that in responding to Burrell's interrogatories the defendants would only admit that they spoke with certain other defendants but would not describe the contents of their conversations. They said nothing about who Elam communicated with. As relevant to these defendants, Burrell states that Berlind discouraged co-defendant Ezepek from listening to the tape in which Morse confessed her kidnapping of Burrell and contends that if he had done so Ezepek would have realized that the alleged kidnapping took place in 1998 (rather than 1996) and that the statute of limitation had not run. Burrell points to Ezepek's supplemental answer to his interrogatories in which he states that he had a discussion with Berlind concerning the possibility of either a kidnapping or unlawful restraint charge against Morse. Therein, Ezepek reports that he advised Berlind that, upon review of the tape, there was little if any evidentiary value because of Burrell's leading questions to Morse, the manner in which Burrell solicited from Morse the answer he wants, and the way Burrell suggested that Morse had lied in her protection from abuse affidavit. He also cited, rather than the statute of limitations, the delay in presenting the case to the Portland Police Department. On the basis of this, Burrell states that as a prosecutor that believes that ninety-five-percent of the time domestic abuse is perpetrated by men, Berlind could not fail to recollect this conversation and her professed inability to recollect the conversation "makes it clear that all these defendants conspired to be deliberately indifferent to William Bur-

rell's and A.B.'s federally protected rights."

The defendants assert that the decisions not to prosecute Burrell and Ryan were based solely upon an evaluation of the material evidence; Anderson, Elam, and Berlind did not manufacture, withhold, falsify, conceal, or destroy evidence relevant to the prosecutions of Burrell and Ryan. Responding to this statement, Burrell explains that the 1996 incident is important only because it shows that Berlind and Elam had evidence as a consequence that Morse confessed to violently assaulting Burrell at that time and that they denied Burrell equal protection when they would not later prosecute Morse. It is Burrell's contention that Morse should have been prosecuted even though Burrell did not consent, believing that he was prosecuted in 1996 despite Morse's lack of consent. Again, Burrell contends that there is an unconstitutional gender-biased domestic violence policy which defeats the State defendants' prosecutorial immunity in Burrell's view. And, again, Burrell contends that Berlind, Anderson, and Elam conspired with co-defendant Dunham in making materially false statements concerning the nature of Ryan's contact with A.B. and that Berlind, along with co-defendants Ezepek and Dunham, suppressed evidence of kidnapping, pointing to his tape of the incident and his two letters to Dunham. Finally, he restates his dissatisfaction that his voicemail messages that contained information relevant to the prosecution of Ryan were "destroyed."

### 3. Burrell's Additional Statement of Material Fact [19]

I have attached in outline form the statement of fact which Burrell filed in

---

19. I note the County's recurring objection to Burrell's statement-of-fact pleading indicating that the record references provided by Burrell have not been filed with the court or other-

wise provided to the County and therefore does not comply with Local Rule 56(e). Many of the County's qualifications state that it is not in a position to respond independent-

responding to the three motions for summary judgment. Again, I have tried not to restate in the body of this Memorandum of Decision the same basic facts that are regurgitated repeatedly in the various pleadings. The sequence in which Burrell presented these facts made it very difficult to discern which statements were intended to support which of his claims. Therefore, I have done my best to reshuffle them according to the incidents that underlie Burrell's constitutional claims. It must also be noted that in his memorandum responding to the motions for summary judgment Burrell has by and large not explained which of these facts he relies on in support of his different claims, let alone explained why they are material, or even relevant, under the governing law. I have for the sake of completeness tried to include a summary of the additional facts that Burrell has made part of the record in order to satisfy the parties that I have tried to consider all of the claims raised by these pleadings. My summary of Burrell's additional facts is attached to this Memorandum of Decision in the form of an Appendix. When I refer to Burrell's additional facts when discussing the resolution of these motions, reference is made to that appendix.

## C. Resolution of Summary Judgment Motions

### 1. Burrell's Inability to Prosecute the Action on A.B.'s Behalf

██ First, Burrell is not permitted to represent his daughter A.B., as a *pro se* litigant. *See Osei–Afriyie by Osei–Afriyie v. Med. Coll. of Pa.*, 937 F.2d 876, 882–83 (3d Cir.1991); *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 60 (2d Cir.1990); *O'Diah v. Volkswagen of Am., Inc.*, No. 03–1043, 2004 WL 67331,1 (1st Cir. Jan.14, 2004) (unpublished opinion).[20] Accordingly, the constitutional violations asserted on A.B.'s behalf cannot be pursued.

### 2. Burrell's Claims Brought Under the Due Process Rubric [21]

██ "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of*

ly as a consequence. In these cases it adopts and incorporates the State defendants' response to those particular paragraphs. Burrell did file a box full of exhibits with the court. Because of my ultimate resolution of the County's motion is favorable to it I can identify no benefit in exploring whether or not Burrell failed to provide adequate access to his exhibits to the County movant.

**20.** In his memorandum in opposition to the three motions for judgment, Burrell responds to this assertion concerning his inability to represent A.B. by also faulting the defendants for ignoring his due process claims that arise out of the violation of his right to seek redress of grievances under the First Amendment, to seek redress for his kidnapping by Morse, and his rights under the state order establishing his parental rights. (Mem. Opp'n Summ. J. at 3.)

**21.** I address Burrell's due process claim related to Anderson's February 2, 2004, phone conversation below when I address the First Amendment claim.

Burrell mentions substantive due process in the same breath as procedural due process in the paragraphs of his complaint that summarize his counts. He makes no argument in his memorandum in response to these motions that he has a tenable substantive due process claim, (*see* Mem. Opp'n Mot. Summ. j. at 3–7) and I am confident that he could not sustain any such claim based on the facts forged in this record, *see County of Sacramento v. Lewis*, 523 U.S. 833, 848 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Suboh v. Dist. Att'ys Office Suffolk County*, 298 F.3d 81, 92 & n. 4 (1st Cir.2002).

*Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). *Loudermill* explained that " 'the root requirement' of the Due Process Clause [is] 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.' " *Id.* (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).)

### a) Anderson, Elam, Berlind, Dunham, and Joyce of due process right conferred by 19–A M.R.A. § 1651 et. seq. by denying Burrell final decision making over who can discipline his daughter

The statute cited by Burrell as having conferred him his rights is section 1651 of title 19–A of the Maine Revised Statutes. It provides:

The father and mother are the joint natural guardians of their minor children and are jointly entitled to the care, custody, control, services and earnings of their children. Neither parent has any rights paramount to the rights of the other with reference to any matter affecting their children.

19–A M.R.S.A. § 1651. As he repeatedly references the 1993 court order that gave him sole authority to discipline A.B., Burrell also seems to be relying on § 1653 which "governs parental rights and responsibilities and court orders for parental rights and responsibilities." *Id.* § 1653(2). Section 1653 contains the following provision apropos the enforcement of the order in instances of noncompliance:

Violation of order concerning parental rights and responsibilities and contact. Either parent may petition the court for a hearing on the issue of noncompliance with the order issued under subsection

2. If the court finds that a parent has violated a part of the order, the court may find that parent in contempt and may:

A. Require additional or more specific terms and conditions consistent with the order;

B. Order that additional visitation be provided for a parent to take the place of visitation that was wrongfully denied; or

C. Order a parent found in contempt to pay a forfeiture of at least $100.

*Id.* § 1653(7); *see also id.* § 1653(11)("Prior to a contested hearing under this chapter relating to initial or modified orders, the court shall refer the parties to mediation as provided in chapter 3.").

Burrell emphasizes that Dunham never inquired of Morse whether she had given Ryan authority to discipline A.B. Nor did he ask Ryan whether he knew of Burrell's rights under the parental order. (Mem. Opp'n Mot. Summ. J. at 6.) Burrell notes that Dunham read his two November 2003 letters which addressed this issue. In Burrell's view this demonstrates gender bias on Dunham's part violative of Burrell's due process rights under his parental rights order. (Mem. Opp'n Mot. Summ. J. at 5.) As best as I can discern, Burrell feels the state actors gave no weight to his interest as a custodial parent in basing their determination to no-complaint the Ryan matter in part because they incorrectly indicated that Ryan had a potential parental discipline defense. (*Id.* at 6.) He cites *Suboh* in support of this claim. Berlind, according to Burrell, knew as far back as the 1996 incident that Morse manipulated events in anticipation of a custody dispute, a theme that reemerged with the 1998 complaint by Morse against Burrell. (*Id.* at 6–7.) Burrell reasons:

Knowing that our custody disputes had always been Morse[']s motivation for lying and saying I assaulted her in preparation for a custody battle, and then being made aware by Dunham that [Burrell] now had physical custody of [A.B.] would have put a reasonable prosecutor in Berlind['] position on notice of a possibility of a parental rights and responsibilities decree [had] been issued.

(*Id.* at 7.)

Burrell relies chiefly on *Suboh v. District Attorney's Office of Suffolk District*, 298 F.3d 81 (1st Cir.2002) in pressing this claim. *Suboh* addressed "procedural due process protections before a governmental official resolves the disputed issue of custody of a child, when there are known competing claims to custody." *Id.* at 91. These defendants were not resolving disputed custody and they did not deny Burrell the process he was due under his parental rights and responsibility order. Although these defendants clearly had responsibilities to investigate any violations of the criminal law by Ryan stemming from the allegations that he harmed A.B., it is evident that if Morse was violating the June 2003 order then the process available to Burrell was available vis-à-vis 19–A M.R.S.A. § 1653(7).

**b) Denial of due process right to seek redress due to the alleged suppression of evidence of Morse's felony kidnapping in order not to find probable cause to arrest Morse**

On the facts before me I cannot but conclude that the City and State defendants are entitled to summary judgment on this claim. It is evident that Burrell believes that the Portland Police Office and the District Attorney's Office did not make the right decision when the defendants involved determined that the tape recording of Morse and Burrell did not provided a basis for charging Morse with kidnapping. However, Burrell has not created a genuine dispute of a fact material to his contention that the defendants suppressed evidence. (*See supra* I. B.1. b; I.B.2.b); App. D.

Notably, there is no dispute that Berlind explained to Burrell in 1998 that she considered it the role of the police to investigate this matter and that if Burrell wished to have the incident investigated he should take the tapes to the police department. She made it clear that the police should make the initial determination as to whether there was a potential crime that should be referred to her office for review. (*See supra* I.B.2.b). There is also no dispute that Burrell did not take the tapes to the police department until 2003. *Id.* The fact that Burrell was disgusted, hurt, and felt powerless after Berlind's message and concluded that there was no point in taking it to the police or filling out a complaint against Morse because Berlind would ignore the evidence, does not form the basis for drawing a *reasonable* inference that Berlind suppressed evidence and denied Burrell his due process rights. There is no reasonable inference possible that Berlind tricked Burrell and affirmatively mislead him to prevent him from bringing the tapes to the Portland Police Department until 2003. *See id.*

With respect to the Portland Police Department's 2003 investigation into the Morse kidnapping, it is undisputed that Ezepek discussed the matter with Berlind and Elam, reviewed the audiotape that Burrell provided Dunham, and had a further discussion with Berlind about whether a kidnapping or unlawful restraint charge against Morse was appropriate. *See* App. D. Ezepek had three grounds for his conclusion that the tape had little evidential value. He also concluded that the delay between the incident and the time that

Burrell brought the tapes to the police was a concern. In his additional statement of material fact Burrell seems to rely primarily on the transcript of his taped conversation with Morse and the fact that the police reviewed this tape and yet did not file charges and did not attempt to return Burrell's phone calls to address his complaints about falsification of the evidence and gender bias. *Id.* Based on this record I cannot discern properly supported facts on which to base a conclusion that Ezepek falsified or suppressed evidence out of some sort of gender bias. That the tapes may have indicated to the officers that Morse had repeatedly lied to law enforcement and filed false reports, does not support a reasonable inference that the reasons cited by Ezepek for not pursuing kidnapping charges against Morse were suspect.[22]

### 3. Burrell's Equal Protection claims

■ Burrell contends that his rights to equal protection have been violated by actions of the defendants motivated by their "pervasive distaste of members of the male gender who have been involved in domestic violence disputes." (Mem. Opp'n Mot. Summ. J. at 9.) It is Burrell's contention that the disparate treatment of Burrell compared to Morse goes back to 1996 with systemic and serial violations continuing through events in 1998 and ongoing today.

"In order to avoid summary judgment on his Equal Protection Clause claim[s]," it is incumbent on Burrell "to tender competent evidence that a state actor intentionally discriminated against [him] because [he] belonged to a protected class." *Alexis v. McDonald's Rest. of Mass., Inc.*, 67 F.3d 341, 354 (1st Cir.1995). Burrell must "prove that the defendants' actions had a

discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 634–36 (7th Cir.2001) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272–74, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Washington v. Davis*, 426 U.S. 229, 239–42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).)

### a) Berlind, favoring Morse because of her gender, "prosecuted" Burrell despite having reasonable doubt based on indications of his innocence

Burrell complains that the State defendants declined to prosecute Morse for the 1996 incident because of their gender-biased domestic violence policy (Mem. Opp'n Summ. J. at 3) yet they pressed ahead with the arrest of Burrell. Burrell asks the court to focus not only on the fact that Berlind dismissed the assault charges against Burrell but also on the fact that she decided not to press charges against Morse instead after she confessed to starting the altercation when Burrell made a comment about her C-section scar. (*Id.* at 9.) Morse, he complains was similarly situated to him at that juncture, and neither of them called the police nor sought to bring charges. In his amended complaint Burrell alleged that there were at least nineteen reasons for Berlind to have reasonable doubt in view of the exculpatory evidence indicating Burrell's innocence.

There is no dispute that two neighbors of Burrell's called the police on October 20, 1996, to report a fight between Morse and Burrell and when they arrived they saw that Morse had a swollen left eye. (*See*

---

**22.** Once again, it is undisputed that Burrell did not press charges against Morse for as-

sault, stalking, or harassment.

*supra* I.B. 2. a). It is undisputed that Morse told the responding officers that Burrell had struck her in the head, spit in her face, punched her in the ear, kicked her in the vagina, and punched her so hard that Morse thought that her ribs had broken (although the x-rays later showed no fracture). (*See supra* I.B. 1.a; I.B.2.a). Burrell told the responding officers that Morse had attempted to dive head first over the banister. (*See supra* I.B.2.a). Officer Moore charged Burrell with aggravated assault. *Id.* At the hospital Morse was treated for multiple facial contusions, contusion to the chest wall, probable fractured ribs (again, the x-rays game back normal), and multiple contusions to the extremities. *Id.*

It is also undisputed that Morse later recanted her story, writing a number of letters to Berlind asking her to dismiss the case against Burrell. Berlind ultimately concluded that she could not meet the burden of proving beyond a reasonable doubt that Burrell assaulted Morse leading Berlind to dismiss the charges against Burrell. (*See supra* I.B.1.a). Morse never signed a complaint against Burrell. *See* App. A. .

The main thrust of Burrell's attempt to see this claim through summary judgment is the exhibits that document Morse's recantation of her allegations that Burrell initiated the assault on her and Morse's post-Burrell-arrest statements that it was Morse who first assaulted Burrell, with Burrell only acting in self-defense. *Id.*

On the record before me I am unable to say that a factfinder could draw reasonable inferences in Burrell's favor that Morse was coerced into lying or that the officers exaggerated and embellished upon, what Burrell concedes were, Morse's lies. Given the undisputed facts of what the offi-

cers were told by Morse, what they witnessed at the scene, and the extent of Morse's injuries it is not reasonable to infer that gender was the motivating factor in arresting Burrell over Morse. The defendants have provided record support for the explanation of their investigation, their analysis of Morse's recantations, and the basis for the final decision to drop the charges (including their lingering reservation that Morse's original story might be nearer the truth). Burrell's attack on the defendants' explanation is based on unsubstantiated conjecture. While it is true that Morse never filed a formal complaint against Burrell, she was the individual at the scene with the significant injuries that she attributed to Burrell. Burrell never filed a complaint against Morse and Burrell has provided no factual support for concluding that he ever told officers that Morse assaulted him.

b) **Berlind gave Morse unfettered access to Berlind and the District Attorney's Office in 1998 when no charges were pending against Burrell but refused to meet with Burrell or listen to his evidence**

 Incorporating my discussion of Burrell's related due process claim concerning Burrell's complaints vis-à-vis Berlind's refusal to listen to his tapes of the alleged kidnapping, (*see supra* I.C. 2. b), Burrell's factual support for this claim is as follows. Berlind agreed to meet with Morse in November of 1998 regarding an alleged assault by Burrell. Burrell emphasizes that Berlind should have been aware that Morse was using her petitions for protection against Burrell as leverage in her efforts to retain custody of A.B. There are disputed facts about whether Berlind got the impression that Morse was using the 1996 incident to prepare for a

custody battle.[23] But Berlind was aware of an affidavit attached to the 1998 protection from abuse petition that repeatedly stressed Morse's concerns with maintaining custody of A.B.[24] In view of the slim (somewhat confusing) factual basis for this claim compiled by Burrell, I conclude that the defendants are entitled to judgment as a matter of law.

c) **Although in 1997 Berlind encouraged Morse to seek help for domestic violence from her office or the police, when Burrell needed help concerning domestic violence Berlind was apathetic and rerouted Burrell to the police department**

■ There is little to be said about this third equal protection ground. I conclude that Berlind is entitled to summary judgment on this claim much for the same reasons that I so concluded vis-à-vis the related due process and the just-discussed equal protection claim. The State defendants have provided facts that support a conclusion that Berlind was concerned that Morse may need help for domestic violence despite Morse's recantation of her allegations against Burrell, (*see supra* I.B. 1.a), and Berlind's equivocation concerning the real story behind Morse's injuries is apparent in the letter from Berlind to Morse explaining her decision to drop the charges against Burrell. Berlind has explained the reasons for her response to Burrell's efforts to get her to investigate the alleged kidnapping and the reason for her referral of Burrell to the police. (*See supra* I.C. 2.b). There is no credible evidence in the facts propounded by Burrell which would permit a factfinder to draw an inference that Berlind made these different decisions because of her gender bias.

d) **Berlind was willing to use a woman's tape of her argument with Chris Rega in a prosecution of Rega but refused to even listen to and utilize Burrell's tape recorded evidence against Morse**

■ Burrell's additional fact in support of this claim is that he presented Dunham with an article from the Portland Press Herald that described how Berlind used portions of a tape-recorded argument between Chris Rega and a woman whom Rega had had a long term relationship with as evidence to support a charge of gross sexual assault against Rega. Berlind concedes that she used portions of a tape recorded argument in that case. It appears that Burrell believes that this is *ipso facto* proof of gender discrimination. However, Burrell can not defend summary judgment by what is really nothing more than an *ipse dixit*, something asserted but not proved.

e) **Anderson, Elam, Berlind, Joyce, and Dunham falsified evidence on Morse's behalf, crediting her with authority under 19–A M.R.S.A. § 1651, in order to clear Morse's boyfriend, Ryan, and ignoring Burrell's assertions that he had sole authority under § 1651**

■ I have discussed the flaws in Burrell's parallel due process theory related to the parental rights and responsibility order above. (*See supra* I.C. 2. a). It is not

23. This exhibit cited by Burrell is a letter to Burrell from Morse saying she told Berlind that she had had a conversation with a police officer about "how you can't play 'mind games' with Bill". (Pl.'s Ex. 4–A(8).)

24. The other evidence that Burrell relies on— Morse's November 11 and 12, 1998, calls to Burrell, both violations of the restraining order—is not probative of Berlind's reasons for meeting with Morse about her petition but not pursuing kidnapping charges against Morse.

at all clear to me that the existence of the order adjudicating Burrell's and Morse's parental rights would have—by operation of law—eliminated any parental defense to criminal charges against Morse's live-in-boyfriend. Furthermore, the undisputed evidence is that the existence of the possible parental defense was but one factor cited for no-complainting the Ryan/A.B. case. (*See supra* I.B. 1. c; I.B. 2. c; App. c (1) & (2)).

In terms of the gender discrimination theory, it was Ryan and not Morse under investigation at this juncture and, to state the obvious, Ryan is in the same gender class as Burrell. Ryan's alleged victim, A.B., was also the same gender as Burrell's alleged victim, Morse. I recognize that Burrell's theory is that the defendants were motivated to no-complaint the Ryan matter in the hopes of protecting Morse because Morse is Ryan's boyfriend. (This is a conjecture for which Burrell has no record evidence beyond his general allegations that the defendants were motivated by gender bias.) However, the same theory could be applied to the 1996 incident, as, at the time, Burrell was Morse's boyfriend (and his case was ultimately dismissed due to Morse's recantation). It is true that the law enforcement process was different for the two different incidents and that Burrell was actually arrested where Ryan was only subjected to investigation. However, the police were actually called to the Burrell/Morse argument by a third-party and Morse had visible signs of serious injury whereas the A.B. allegations emerged weeks after the alleged go-to-your-room

incident; there was no incident to which the police were called to respond.

Burrell believes that the defendants' views that more men than women are the aggressor in domestic violence cases—their "statistical admissions"—animated their decision not to pursue the investigation into Ryan's alleged assault of A.B.[25] However, there is nothing in this record that would support a conclusion that the "grab-only" characterization of the incident was the by-product of any of these defendants' beliefs vis-à-vis the different rates of domestic assault between genders. To the contrary, the record evidence demonstrates that the police instituted a serious inquiry into the matter. Furthermore, the real parties to the police inquiry were A.B., a female, and Ryan, a male. Following Burrell's theory that there is a statistical bias against men in the district attorney's office, the incident would have resulted in the arrest of Ryan rather than the no-complaint. It really does not matter, in terms of constitutional significance, that Burrell's expert thinks that the police mishandled the A.B./Ryan investigation. Their alleged failure to properly bring charges in A.B.'s case cannot be construed as evidence of a pattern of gender bias discrimination.

4. **First Amendment claim apropos the February 4, 2004, phone conversation with Anderson and claim that Burrell was denied of due process right when Anderson intimidated Burrell into not seek-**

---

**25.** Burrell relies heavily on *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), and Justice Steven's concurring opinion therein, in support of his equal protection theory. That case struck down a state statute that prohibited the sale of 3.2% beer to males under the age of 21 but allowed females in the 18–21 year category to legally drink such a beverage. The criminal statute under which

Burrell was charged on its face applies with equal force to males and females. The Cumberland County Domestic Violence Policy uses the female pronoun but carefully disclaims the perception that only women are the perpetrators. Thus, at most Burrell's claim is that the district attorney's office had a custom or policy of selectively enforcing the gender-neutral criminal assault statute.

ing redress through the courts[26]

■ Under his First Amendment rubric Burrell contends that his right to petition the government for redress of his grievances was violated when he was told to stop leaving voicemail messages in the middle of the night. (Mem. Opp'n Mot. Summ. J. at 14–15.) He states that he must only demonstrate that a person of ordinary firmness would have had their speech chilled and not necessarily that his speech was actually inhibited or suppressed. (*Id.* at 16.) In his view, Anderson's call, in which she orders him to stop accusing people of discrimination and of being racist and biased, violated his right to speak out against a policy that discriminates against men who are involved in domestic violence disputes. (*Id.* at 17.)[27] He links this First Amendment claim with a denial of due process vis-à-vis the speech infringement.[28]

The transcript of the call from Anderson to Burrell is set forth in Subsection G. of the Appendix, and its contents are not in dispute. The State defendants argue that Burrell lacks standing to pursue what they describe as a frivolous claim. I do not believe that the cases they cite, *New Hampshire Right to Life PAC v. Gardner,* 99 F.3d 8, 13 (1st Cir.1996) and *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), are a very good fit as they involve challenges to a statute alleged to chill free speech, on the one hand, and Army surveillance techniques on the other. Burrell is complaining of what he views as free-speech-chilling statements made directly to him and tailored for him by Anderson[29] Burrell relies primarily on *Mansoor v. Trank* 319 F.3d 133, 138–39 (4th Cir.2003) and the decision below, *Mansoor v. County of Albemarle,* 189 F.Supp.2d 426, 432—35 (W.D.Va.2002), a case which addressed First Amendment rights in the context of adverse employment action. The dynamics of those cases are also not a great fit for Burrell's claim.

I do, however, conclude that Anderson is entitled to summary judgment on this claim. I could find no decision that supports the proposition that a citizen has a First Amendment right to leave non-emergency voicemail messages on a district attorney's (or a police officer's) machine in the middle of the night. If Burrell was frustrated by an inability to speak with the district attorney's office on the phone during working hours he was free to submit the substance of those messages in written form to the district attorney's office. With respect to getting redress for his charges of discrimination—which I agree is a matter of public concern—Anderson's frustra-

26. Burrell ascribes a conspiracy to this call, suggesting that the other defendants encouraged Anderson to make this call. There is absolutely no evidence put forth by Burrell that any of the other defendants had any part in the placement of this call or its contents.

27. In the same breath Burrell lists Chitwood, but there is no fact to support the assertion that Chitwood called Burrell or even had any direct communication with him. In his amended complaint Burrell only alleges violations of his First Amendment right stemming from Anderson's phone call.

28. Burrell contends that he is entitled to judgment as a matter of law based on the record-

ing of Anderson's call to him but that he would like the issues left for the jury. (*Id.* at 17.)

29. Burrell argues that "even if" Anderson called Burrell and told him to stop complaining pursuant to an ordinance there must be a reasonable and definite standard in that hypothetical ordinance by which she made this decision. (Mem. Opp'n Summ. J. at 15.) He complains that Anderson's discretion was unbridled and thus run afoul of the First Amendment. (*Id.*) He argues that the government cannot regulate speech based on its substantive content or the message it conveys.

tion-laden directive that Burrell stop leaving voicemail messages with her office did nothing to impede his ability to file this current complaint to seek redress for what he views as a gender-biased custom or policy. Indeed, during the phone conversation Anderson said, "if you want to file a complaint against me, you go right ahead." Thus, Anderson is entitled to judgment on Burrell's First Amendment/due process claims.

### 5. 42 U.S.C. § 1985 and § 1986 Claims

In defending the summary judgment motions, Burrell relies on the existence of the statutory provision of 42 U.S.C. § 1985(2) and (3).[30] However, Burrell offers absolutely no explanation as to how the undisputed or disputed material facts relate to these statutory provisions. (*See* Mem. Opp'n Mot. Summ. J. at 18–19.)

With respect to a claim under 42 U.S.C. § 1985(3), the First Circuit Court of Appeals has summarized:

An actionable section 1985(3) claim must allege that (i) the alleged conspirators possessed "some racial, or perhaps otherwise class-based, invidiously discriminatory animus," *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), and (ii) their alleged conspiracy was "aimed at interfering with rights ... protected against private, as well as official, encroachment." *United Bhd. of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). *See also Libertad v. Welch*, 53 F.3d 428, 446 (1st Cir.1995) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68, 113 S.Ct. 753, 122 L.Ed.2d 34

**30.** (2) Obstructing justice; intimidating party, witness, or juror

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

(3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

(1993)). The conspiracy allegation must identify an overt act. *See Griffin*, 403 U.S. at 93, 91 S.Ct. 1790; *Libertad*, 53 F.3d at 450 n. 18. If no racial animus is charged, a discriminatory class-based animus must be alleged. *See Harrison v. Brooks*, 519 F.2d 1358, 1359 (1st Cir. 1975) (citing *Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798). "The requirement that the discrimination be 'class-based' is not satisfied by an allegation that there was a conspiracy which affected the interests of a class of persons similarly situated with the plaintiffs. Rather, the complaint must allege facts showing that the defendants conspired against the plaintiffs because of their membership in a class and that the criteria defining the class were invidious." *Id.* at 1359–60. *Romero–Barcelo v. Hernandez–Agosto*, 75 F.3d 23, 34 (1st Cir.1996).

▆▆ The only allegation tethered to this § 1985 claim in Burrell's amended complaint is in paragraph 260 which alleges that Berlind, Dunham, Anderson, and Joyce falsified evidence in A.B.'s assault case and that Berlind and Ezepek suppressed evidence of felony kidnapping in order to avoid finding probable cause to arrest Ryan and Morse, respectively. At this summary judgment stage Burrell has a duty to identify and provide record support for the factual basis for his conspiracy claims. In responding to the defendants' statement of facts pertaining to conspiracy, Burrell points to what he describes as the defendants' evasive responses in discovery concerning what was said between them about Burrell during these investigations. He complains that they cannot identify the contents of their conversations. (*See supra* I.B. 2. e). Burrell has provided no record evidence for his con-tention that Berlind discouraged Ezepek from listening to the Morse tapes. Indeed, Burrell states that Ezepek did, in fact, listen to the tapes and made a determination that they had little evidentiary value. *Id.*[31] With respect to the Ryan/A.B. investigation, Burrell relies on his conclusory allegation that the defendants made materially false statements when they characterized Ryan's contact with A.B. In view of the record before me concerning the defendants' investigation into and reports on the Ryan/A.B. incident, (*see supra* I. B.1.c; I.B. 2. c); App. C., there is no genuine dispute vis-à-vis the material facts. Burrell's difference of opinion with the characterization of the assault is not sufficient to get him by summary judgment, *see Rosenfeld v. Egy*, 346 F.3d 11, 17 (1st Cir.2003) (restating that a court deciding motions for summary judgment need not embrace inferences that are "wildly improbable," based on "tenuous insinuation," or "supported speculation."); *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991) ("[A] party 'must do more than simply show that there is some metaphysical doubt as to the material facts.' ")(quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As I have concluded above that Burrell cannot defend summary judgment vis-à-vis his § 1985 conspiracy claim by Anderson's or Joyce's supervisees, the record provides no support for holding Anderson or Joyce liable as supervisors under § 1986.

### Cumberland County's Liability

▆▆ The County has filed a statement of material fact that is considerably briefer than the three versions of the fact set forth above. Nothing in their factual nar-

---

**31.** Burrell thinks that Ezepek made an incorrect judgment as to the running of the statute of limitation but given the other ground Eze-pek had for not charging Morse, conceding this fact to Burrell makes no difference to my determination.

rative or Burrell's response thereto creates a genuine dispute of material fact that could leave liability at the County's doorstep even if it is ultimately responsible for the custom or policy surrounding domestic violence arrests (a point the County does not concede).[32] If there is no genuine dispute that any of the individual defendants inflicted constitutional harm there can be no liability on a theory of municipal (or supervisory) liability for an unconstitutional custom or policy. *Wilson v. Town of Mendon,* 294 F.3d 1, 6 –7 (1st Cir.2002).

## II. Motion for Sanctions

■ Burrell's argument that the defendants should be subject to sanctions merits little discussion. With respect to the dating and numbering of Dunham's reports on the Ryan/A.B. incident, I perceive Dunham's explanation to be entirely reasonable and Burrell's suspicions that there is something untoward concerning the reports to be based on no credible evidence and, indeed, to be entirely baseless. *See cf. Carey,* 923 F.2d at 21. Apropos Burrell's contention that any of the defendants had a duty to keep recordings of his voicemail messages in order to preserve evidence favorable to Burrell in this civil litigation, I outright reject this notion.[33] I do note that Burrell's pleadings give a pretty thorough picture of what Burrell's concerns were at the time he left the messages and what he deemed to be matters of "great public concern."

## III. City Defendants' Motion for Summary Judgment on their Counterclaims

■ Finally, the City defendants have moved for summary judgment on their defamation, libel, and slander counterclaims. They state that Burrell admits to intentionally accusing Dunham and Ezepek of "being apathetic, evasive and distant"; accusing Joyce, Dunham, and Ezepek of "conspiring" to have Anderson intimidate and threaten Burrell into not pursuing discrimination and falsification of evidence charges; and accusing Joyce, Dunham, and Ezepek of "furtive" conduct. They point out that Burrell admits that Dunham "may have" spent years developing a rapport within the Portland community and that he "may have" earned a reputation in the Portland community for honesty, integrity and fairness in dealing with the public. And, Burrell admits that by filing "what he believes are truthful allegations" in his amended complaint he may have, in fact, caused damage to the character and reputations of Joyce, Dunham, and Ezepek.

Based on these skeletal factual admissions, the City defendants contend I should enter judgment on their counterclaims. They do not even cite to a single standard for these state law claims. Based on this quarter-hearted effort by the City defendants I decline to grant them summary judgment on these counterclaims. I also decline to retain supple-

---

**32.** With respect to the County's liability Burrell cites many cases in this district that have addressed various types of municipal/county liability claims. He then states: "I find it next to impossible for anyone to find that Anderson and Berlind[,] after admitting to contributing to the creation, updating[,] and maintenance of a municipal policy statement[,] could conclude that they are not responsible for it." (Mem. Opp'n Mot. Summ. J. at 21.)

**33.** If Burrell thought that it should have been so evident to the defendants that Burrell would need a copy of Burrell's one-sided messages it should have been evident to Burrell himself. In view of the recordings of conversations that Burrell has submitted it is a wonder to me that he did not record his messages on his own.

mental jurisdiction over them, *see* 28 U.S.C. § 1367; *Lares Group, II v. Tobin,* 221 F.3d 41, 45 (1st Cir.2000), the last vestiges of this federal suit.

### *Conclusion*

I now **DENY** Burrell's motion for sanctions. (Docket No. 72.) I also now **GRANT** the three motions for summary judgment (Docket Nos. 58, 59 & 61) on all of Burrell's claims against the three sets of defendants as there is no genuine dispute of material fact that would justify denying them judgment. I **DENY** the City defendants judgment on their counterclaims (*see* Docket No. 61) and decline to retain supplemental jurisdiction. Accordingly the counterclaim is **DISMISSED** without prejudice.

*So Ordered.*